THE RECTOR, WARDENS AND VESTRYMEN OF TRINITY-ST. MICHAEL'S PARISH, INC., ET AL. *v.* THE EPISCOPAL CHURCH IN THE DIOCESE OF CONNECTICUT ET AL.
THE EPISCOPAL CHURCH IN THE DIOCESE OF CONNECTICUT ET AL. *v.* TRINITY-ST. MICHAEL'S PARISH, INC., ET AL.
(14434)

PETERS, C. J., CALLAHAN, BORDEN, NORCOTT and KATZ, Js.

Argued December 8, 1992—decision released March 2, 1993

*William H. Narwold,* with whom was *William H. Bright, Jr.,* for the appellants (Trinity-St. Michael's Parish, Inc., et al.).

*David J. Elliott,* with whom were *Allan B. Taylor* and *Alan T. Levesque,* for the appellees (The Episcopal Church in the Diocese of Connecticut et al.).

KATZ, J. This appeal involves a dispute over the ownership of church property arising out of the withdrawal of a local parish from its prior affiliation with a hierarchical church organization. The issue is whether, in the absence of an express trust, the governing church documents, read "in purely secular terms,"[1] impose a trust in favor of the general church on property held by a local parish.

This case originated as two separate actions. The Episcopal Church in the Diocese of Connecticut (Diocese) et al.[2] and Trinity-St. Michael's Parish, Inc., et al.,[3] each brought a declaratory judgment action seeking a declaration of sole right, title and interest in certain real and personal church property located in Fairfield.[4] The trial court, *Koletsky, J.,* consolidated

---

[1] *Jones* v. *Wolf,* 443 U.S. 595, 604, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979).

[2] The following parties joined the Diocese in this action: the Missionary Society of the Diocese of Connecticut, the Right Reverend Arthur E. Walmsley, the Bishop of the Diocese, and the Reverend Robert Sloan Beecher, William H. Baird, Janice Wilson and Hugo George Kenyon of the Diocese.

[3] The following parties joined Trinity-St. Michael's Parish, Inc., in this action: the Reverend Rocco A. Florenza, Senior Warden James LaScala and Junior Warden Gayle Griffin, and vestry members Susan Fulljames, Edna Gough, Robert Haux, Jeff Robertson, Nora Lee Vayser, Matthew Victor, Paul Molocko, Warren Schmitt and Gail Soucy of Trinity-St. Michael's Parish, Inc.

[4] In its declaratory judgment action, the Diocese et al. named Trinity-St. Michael's Parish, Inc., as a defendant, in addition to the following members of the vestry, officers and wardens of Trinity-St. Michael's Parish, Inc.: the Reverend Rocco A. Florenza, Marie Reed, Gordon Sears, David Mattar, John Crane-Baker, Frank Regnery, Virginia Southouse, R. Preston Smith, Madge Blagys, Daniel B. C. Gardiner, Ron Burke, George Cody, Bonnie Giaquinto and Gayle Griffin, of Trinity-St. Michael's Parish, Inc.

these actions and designated Trinity-St. Michael's Parish, Inc., et al., as the defendants. Following a trial to the court, the trial court rendered judgments in favor of the plaintiffs, the Diocese et al., declaring the Diocese to be the owner of the property involved in both actions. From those judgments, the defendants appealed to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgments of the trial court.

I

To understand the constitutional boundaries of the inquiry necessitated by this appeal, we must first describe our authority in adjudicating church property disputes. Civil courts have the general authority to resolve the question of church property ownership. *Jones* v. *Wolf,* 443 U.S. 595, 602, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979); *New York Annual Conference of the United Methodist Church* v. *Fisher,* 182 Conn. 272, 281, 438 A.2d 62 (1980) *(New York Annual Conference).* "The State has an obvious and legitimate interest in the peaceful resolution of property disputes and in providing a civil forum where the ownership [and control] of church property can be determined conclusively." *Jones* v. *Wolf,* supra, 602; *Presbyterian Church in the United States* v. *Mary Elizabeth Blue Hull*

*Episcopal Church in the Diocese of Connecticut* v. *Trinity-St. Michael's Parish, Inc.,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV87 0326563S (June 21, 1990). In its declaratory judgment action, Trinity-St. Michael's Parish, Inc., et al. named as defendants the Diocese, the Missionary Society of the Diocese of Connecticut and the Right Reverend Arthur E. Walmsley, Bishop of the Diocese. *Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Connecticut,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV87 0326093S (September 4, 1990). The attorney general of the state of Connecticut was named as a defendant in both actions, but he declined to appear in this case or participate in this appeal because he did not believe that this litigation was in the public interest.

*Memorial Presbyterian Church,* 393 U.S. 440, 445, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969) (*Blue Hull*). The first amendment to the United States constitution,[5] however, " 'severely circumscribes the role that civil courts may play in resolving church property disputes.' "[6] *Jones* v. *Wolf,* supra, quoting *Blue Hull,* supra, 449. It therefore forbids civil courts from resolving church property disputes by inquiring into and resolving disputed issues of religious doctrine and practice. *Jones* v. *Wolf,* supra; *Maryland & Virginia Eldership of the Churches of God* v. *Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 368, 90 S. Ct. 499, 24 L. Ed. 2d 582 (1970) (Brennan, J., concurring) (*Sharpsburg*). Accordingly, courts may not support the tenets of any one religion and must respect the right of all persons to choose their own course with reference to religious observance. See *Jones* v. *Wolf,* supra. States are free to adopt any approach to adjudicate church property disputes " '[s]o long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' " Id., quoting *Sharpsburg,* supra (Brennan, J., concurring).

The United States Supreme Court first adjudicated a church property dispute in *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1872). *Watson* involved a church schism and property dispute that arose out of the Civil War. When a group of members of a local Presbyterian church in Kentucky withdrew from the national Presbyterian church rather than obey the national church's order to support the union and disavow slavery, the court was called upon to determine ownership of church property. It held that if a local

---

[5] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[6] The first amendment to the United States constitution is applicable to the states through the fourteenth amendment. See *Cantwell* v. *Connecticut,* 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940).

church is congregational in nature, the ordinary principles that govern associations should be relied upon to determine the rights of the conflicting groups. The corporate and property decisions made by a majority of the members of the local church "or by such other local organism as [the congregational organization] may have instituted for the purpose of ecclesiastical government" should be enforced. Id., 724. If, however, "the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization"; id., 722–23; a court has the obligation to enforce the decision of the highest church tribunal that has ruled on a question "of discipline, or of faith, or ecclesiastical rule, custom, or law . . . ." Id., 727.[7] As evidenced by the court's decision in enforcing the resolution of the property dispute by the national Presbyterian church in *Watson,* issues of control over and rights to property are subsumed within that list. Id.; see also *Sharpsburg,* supra, (Brennan, J., concurring).

Over one hundred years later, the United States Supreme Court adopted and applied a somewhat different approach, invoking the "neutral principles of law" for resolving disputes over church property. *Jones* v. *Wolf,* supra, 602. This method, as enunciated by the United States Supreme Court in *Blue Hull,* relies on objective, traditional concepts of trust and property law familiar to attorneys and judges. It calls "for the com-

[7] The absolute deference afforded the decisions of hierarchical church tribunals has been subsequently tempered by the United States Supreme Court in *Serbian Orthodox Diocese* v. *Milivojevich,* 426 U.S. 696, 713, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976), in which the court stated that determinations by such tribunals will be enforced in the absence of fraud or collusion.

pletely secular examination of deeds to the church property, state statutes and existing local and general church constitutions, by-laws, canons, Books of Discipline and the like to determine whether any basis for a trust in favor of the general church exists." *Protestant Episcopal Church* v. *Graves,* 83 N.J. 572, 578, 417 A.2d 19 (1980), cert. denied sub nom. *Moore* v. *Protestant Episcopal Church,* 449 U.S. 1131, 101 S. Ct. 954, 67 L. Ed. 2d 119 (1981); see also *Sharpsburg,* supra.

*Jones* v. *Wolf,* supra, concerned a property dispute between the local church and the general church in which the Georgia courts had examined the property deeds, state statutes, local church charter, the general church constitution and Book of Church Order. Because this examination did not reveal any language of trust in favor of the general church, the Georgia courts were left with a mere connectional relationship between the local and general church that they found was an insufficient basis upon which to establish property rights in the general church. In the absence of anything more, the court ruled that legal title to the church property was vested in the local church congregation. In approving this "neutral principles of law" approach as an acceptable method of resolving the particular dispute, the United States Supreme Court concluded that although the analysis may involve examination of some religious instruments, such as a church constitution, the inquiry must be performed in purely secular terms without relying "on religious precepts in determining whether the document indicates that the parties have intended to create a trust." Id., 604.

Before *Jones* v. *Wolf,* supra, we followed *Watson* in *Independent Methodist Episcopal Church* v. *Davis,* 137 Conn. 1, 13, 74 A.2d 203 (1950), and in *Trustees of Trinity Methodist Episcopal Church* v. *Harris,* 73 Conn. 216, 224, 47 A. 116 (1900). In the year following *Jones* we had the opportunity to reexamine this

issue in *New York Annual Conference,* supra. Recognizing that each of these possible approaches for resolving church property disputes has received explicit approval by the United States Supreme Court and that we were free to adopt either approach, or any other approach that did not involve consideration of doctrinal matters, we decided that the *Jones* and *Watson* methods should be read to complement one another.

Therefore, in resolving ownership disputes over church property, a civil court must first determine whether an express trust exists, and if it does, the court must enforce its terms. If no express trust is found, the court must determine whether an implicit trust exists in favor of the general church. In conducting this inquiry, the court must examine the polity of the church,[8] in addition to the church constitution and its canons, for language of trust in favor of the general church. See *New York Annual Conference,* supra, 282.

Inasmuch as the polity of the church represents the agreement of church members in a particular system of government, including the structural allocation of authority, a civil court must ascertain the facts to determine whether members of a parish within a hierarchi-

---

[8] "Polity" refers to the particular system of church government upon which church members have agreed, including the structural allocation of authority within the church and the established procedures for resolving internal disputes. Note, "Judicial Intervention in Disputes Over The Use of Church Property," 75 Harv. L. Rev. 1142, 1143 (1962). A hierarchical organization has been defined by the United States Supreme Court as a general organization of churches having similar faith and doctrine with a common ecclesiastical leader. *Kedroff* v. *St. Nicholas Cathedral,* 344 U.S. 94, 110, 73 S. Ct. 143, 97 L. Ed. 120 (1952). "Under the episcopal form of polity, all authority reposes in certain ecclesiastical officers." A. Adams & W. Hanlon, *"Jones* v. *Wolf:* Church Autonomy and the Religion Clauses of the First Amendment," 128 U. Pa. L. Rev. 1291, 1292 n.6 (1980). For example, bishops have the authority to govern their dioceses. In the Diocese of Connecticut, the Right Reverend Arthur E. Walmsley is the Bishop and, pursuant to the constitution and canons of the Diocese and those of the Episcopal Church, is the ecclesiastical authority of the Diocese.

cal church organization have agreed to be bound by the higher ecclesiastical authority within the church. See A. Adams & W. Hanlon, *"Jones* v. *Wolf:* Church Autonomy and the Religion Clauses of the First Amendment," 128 U. Pa. L. Rev. 1291 (1980). The underlying rationale for this contractual approach is to permit individuals or groups to affiliate themselves with other individuals or groups for religious purposes without interference from the courts. See note, "Constitutional Law—First Amendment—the Role of Civil Courts in Church Disputes," 1977 Wis. L. Rev. 904, 910.

In this case, the parties have agreed, and we concur, that title 1, canon 7, § 4 of the Episcopal Church canons (hereinafter the Dennis Canon), enacted at the General Convention of the Episcopal Church in 1979, is an express trust provision. It states: "All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons." Because the Dennis Canon was not enacted until 1979, it is undisputed that no express trust existed at the time of the relevant property transactions involved in this case.

The defendants maintain that the absence of an applicable express trust provision at the time they acquired their property definitively resolves the trust issue in their favor. In support of this claim, they cite a California case, *Protestant Episcopal Church* v. *Barker,* 115 Cal. App. 3d 599, 171 Cal. Rptr. 541, cert. denied, 454 U.S. 864, 102 S. Ct. 323, 70 L. Ed. 2d 163 (1981). We decline to follow that case because it directly con-

tradicts our determination in *New York Annual Conference,* supra, 283: "Where the property is not subject to an express trust, we must decide, without becoming entangled in religious controversy, what is the nature of the relationship between the [Episcopal] Church and the local church, and the nature of the affiliation of [Trinity-St. Michael's Parish, Inc.,] to the [Episcopal] Church."

Thus, in determining whether the defendants and their predecessors had agreed to the manner in which their property would be held in regard to the Diocese, the trial court was required to determine whether there was, nonetheless, an implied trust. Where the nature of the relationship may, without entanglement in religious doctrine, be judicially determined by reference to the polity of the church, by its constitution and canons, and by the clear factual evidence regarding the historical subordinate relationship between the local church and the general church, there is no reason for a court not to enforce the terms of that relationship. If a trust has been implicitly acknowledged by the parties and is embodied in some legally cognizable form, it must be respected. If the trial court has reasonably found that the facts before it establish the existence of an implied trust, this court, in turn, must sustain the judgment of the trial court.

II

The following facts, as stipulated by the parties,[9] or as reasonably found by the trial court, provided the basis for the trial court's decision. The factual record addressed two issues: the polity of the Protestant Episcopal Church, and the historical relationship of the defendants and their predecessors with the Protestant Episcopal Church.

---

[9] The parties submitted a lengthy joint stipulation of facts.

## A

The uncontroverted evidence at trial demonstrated that the polity of the Protestant Episcopal Church of the United States of America (PECUSA) is hierarchical.[10] PECUSA was established in 1789 by the General Convention of the Episcopal Church in Philadelphia, Pennsylvania. It presently consists of ninety-five geographical dioceses that are presided over by a bishop, who is the ecclesiastical authority. Each diocese is made up of a confederation of congregations, known as parishes, located in its geographic area. Parishes that are affiliated with PECUSA hold their membership in a diocese of the church, and not in the general church.

PECUSA is governed by the General Convention of the Episcopal Church and by the Episcopal Church's own constitution and canons. The Episcopal Church's legislative body is the General Convention of the Episcopal Church, consisting of the House of Bishops and the House of Deputies, either of which may originate and propose legislation. The General Convention has enacted a constitution and a set of church laws, known as canons, by which all affiliated dioceses and local churches are bound.[11] Additionally, each diocese has

---

[10] The defendants offered no testimony, expert or otherwise, contradicting the plaintiffs' expert testimony that the polity of the Episcopal Church is hierarchical. On the contrary, in their brief, the defendants presuppose that the polity of the church is hierarchical, but contend that the canons are of moral value only and do not create enforceable trust obligations.

[11] The defendants argue that the canons of PECUSA and the Diocese have no legal significance, but that they are of moral value only. This contention is refuted by *New York Annual Conference of the United Methodist Church* v. *Fisher,* 182 Conn. 272, 297, 438 A.2d 62 (1980), and *Jones* v. *Wolf,* 443 U.S. 595, 606, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979), both of which expressly direct civil courts to identify and apply "relevant ecclesiastical documents" in determining the existence of a trust. The testimony of the plaintiffs' witnesses was consistent and uncontradicted: PECUSA considers its canons to have legal effect and to be enforceable in a civil court. This is particularly so in light of the provisions of General Statutes §§ 33-265

its own supplementary constitution and set of canons by which each diocese and its local parishes are bound. The Episcopal Church in the Diocese of Connecticut is a constituent part of PECUSA, and accedes to, recognizes and adopts the General Constitution of PECUSA and acknowledges the authority of the Episcopal Church thereunder.

Uncontradicted testimony offered by the plaintiffs at trial described the attributes of the hierarchial polity of PECUSA.[12] Bishop Orris J. Walker of the Diocese of Long Island described PECUSA's polity as one in which the parish is the local manifestation of the larger Episcopal community. Walker testified that, prior to the 1979 enactment of the Dennis Canon, the polity of PECUSA embraced the concept of a trust by implication because of the acceptance by a parish of the doctrine of the church and its stewardship over parochial property beginning with the formation of the parish. Moreover, he testified that the polity of PECUSA was exemplified in the understanding between a diocese and a parish that parochial property—both real and personal—is held "in trust for the use of the ministry and mission of the Protestant Episcopal Church."[13]

---

and 33-266, providing that a parish may be formed, conduct its affairs and "have power to receive and hold . . . property, real or personal, that has been or may be conveyed to them," only as provided and prescribed by the constitution, canons and regulations of PECUSA. Indeed, James E. Annand, then dean of the Berkeley Divinity School at Yale University, testified that these statutes *explicitly* codified, as a matter of state law, the polity, constitution and canons of PECUSA.

[12] At oral argument, the defendants raised for the first time the claim that no expert testimony was needed in order for the trial court to assess the intent of these governing documents and that the trial court incorrectly entertained and relied upon such testimony. Because this issue was not briefed, we deem it waived. *Kiniry* v. *Danbury Hospital*, 183 Conn. 448, 449, 439 A.2d 408 (1981). Moreover, this is a curious argument to advance even at such a late stage in light of the expert evidence, albeit in book form, that they advanced at trial.

[13] Unquestionably, matters pertaining to property and the business affairs of PECUSA, dioceses and parishes are governed by the canons of PECUSA

Walker, who was the vice-chair of the Committee on Constitution and Canons of the House of Deputies at the General Convention, testified that the preamble

and of the diocese. These canons and the constitution also illustrate the manner in which a parish accedes to the authority of the diocese in matters both spiritual and temporal and in which the diocese accedes to the authority of PECUSA. Article 1 of the constitution of the Diocese provides that the Diocese, as a constituent part of PECUSA, accedes to, recognizes and adopts the general constitution of that church and acknowledges its authority accordingly. The Diocesan canons provide for the formation of parishes only with the authority of the bishop. Under the Diocesan canons, persons wishing to form a parish must request permission from the Diocese to unite as a parish under the laws of the church. If approved, the Diocese admits the parish into union with the Diocese and grants a certificate of permission for the organization of the parish. Similarly, no parish may terminate its membership in the Diocese without the permission of the bishop. The Diocesan canons further provide that no rector may be called to a rectorship without the written permission of the bishop. Additionally, the manner by which parishes are admitted to union with the Diocese and PECUSA is highly indicative of the hierarchical polity of PECUSA and the consensual nature of this polity. The canons provide for the formation of new parishes within a diocese and vest the authority for the formation of such parishes in the bishop. The canons further provide that the control of the worship and spiritual jurisdiction of the parish are vested in the rector, subject to the canons of PECUSA and counsel of the bishop.

Business affairs relating other than to real property are also governed by the canons. Title 1, canon VII governs matters pertaining to personal property as well. This canon provides for the manner in which funds of a diocese or parish are to be held in trust; the keeping of records with respect to all trust and permanent funds; the bonding of treasurers and custodians of parishes; the keeping of books of accounts to provide the basis for satisfactory accounting; and the auditing of all accounts of the diocese and parishes annually. Canon II of the Diocesan canons provides for the submission by every parish of a parochial report and for financial assessments of the parishes by the Diocese. Canon VIII requires the observation of standard business methods by a parish, including the manner of deposit of trust and permanent funds; the keeping of records with respect to trust funds; the keeping of books of accounts so as to provide the basis for satisfactory accounting; the annual accounting by certified public accountants of such funds; and adequate insurance. Canon VIII further provides that no "Vestry, Trustee or other body authorized by civil or canon law to hold, manage or administer real property for any parish, mission station, congregation or institution shall encumber or alienate the same or any part thereof . . . without the written consent of the Bishop and the Standing Committee . . . ." Although none of these canons specifically controls whether an

paragraphs to Resolution D-24 describe the purpose of the Dennis Canon, reflect generally the polity of PECUSA, and introduce no new concepts to the previous understanding of the church and its parishes with respect to the ownership of parochial property.

Walker also referred to two significant church documents. The first was the preamble to Resolution D-24, which states in part: "Whereas, the Episcopal Church is an hierarchial church, in which local parish churches are part of, and are subject to, the Constitution and Canons of the Episcopal Church and of the Diocese in which they are geographically present; and whereas, the Episcopal Church recognizes that local parishes have broad autonomy in the use of their property, so long as they act within the confines of the Constitution and Canons of the Episcopal Church and of the Diocese in which they are geographically present." Walker then added that title 1, canon 7, § 3 of the canons of the Episcopal Church, which prohibits the encumbrance or the alienation of parochial real property without the written consent of the Bishop and the Standing Committee of the Diocese, expresses "the same thing but in different words. It expresses the Polity of the Church and how we have operated down through the years," specifically as regards the holding of the parochial property.

Title 1, canon 7, § 5 of the canons of the Episcopal Church provides that the several dioceses may, at their election, further confirm the trust declared by § 4 by appropriate action, but that no such action is necessary for the existence and validity of the trust. The Dioce-

express trust for real or personal property exists, combined with the constitution and canons of PECUSA and the Diocese, the canons pervasively govern matters both spiritual and temporal within the Episcopal Church, its dioceses and parishes. They strongly reflect the polity of the church as one in which the parish is the local manifestation of PECUSA to be used for its ministry and mission.

san Bishop, the Right Reverend Arthur E. Walmsley, testified that the Diocese took no further action, pursuant to § 5 of the Dennis Canon, regarding the property in issue because the Diocese believed that § 4 merely restated long-standing Episcopal doctrine and understanding regarding parochial property and that no further action on its part was needed. In addition, the Diocese interpreted what had already been contained in title 1, canon 7, § 3, which the Diocese had enacted in 1956 as Diocesan Canon VIII, § 3, to cover the same subject matter as the Dennis Canon.[14] Walker concurred.

Hugh R. Jones, formerly an associate judge for twelve years on the New York Court of Appeals, testified as an expert witness because of his extensive work at the First General Convention of PECUSA, his position as chancellor to four successive bishops in the dioceses of central New York, his membership on the executive council and the commission of the Episcopal Church National, and his position as chancellor to three successive presiding bishops of PECUSA. As chancellor, Jones described having been consulted on a wide variety of areas regarding the canons generally and, specifically, the canonical aspects of church property disputes. His positions required, among other things, that he attend PECUSA conventions and aid in the legislative process. His testimony was significant

---

[14] In the view of the Diocese, the Dennis Canon was enacted in 1979 to address the decision in *Jones* v. *Wolfe*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979), and to make explicit that which was already implicit. The Supreme Courts of Colorado and New Jersey have held that the Dennis Canon both created an enforceable trust upon Episcopal parochial property and did nothing but confirm the relationships existing among PECUSA and dioceses and parishes within the Church. *Bishop & Diocese of Colorado* v. *Mote*, 716 P.2d 85, 105 n.15 (Colo.), cert. denied, 479 U.S. 826, 107 S. Ct. 102, 93 L. Ed. 2d 52 (1986); *Protestant Episcopal Church* v. *Graves*, 83 N.J. 572, 581, 417 A.2d 19 (1980), cert. denied sub nom. *Moore* v. *Protestant Episcopal Church*, 449 U.S. 1131, 101 S. Ct. 954, 67 L. Ed. 2d 119 (1981).

because of his position at the convention when the Dennis Canon was passed. Jones also described the attributes of the hierarchical polity of PECUSA. He explained the import of its written legislative history: the preamble of the Dennis Canon "recognizes that local parishes within this framework have the right to make churches and use the property, but it has got to be used with the doctrine, worship, and discipline of the church." He viewed the Dennis Canon as itself recognizing a preexisting trust on parochial property in favor of PECUSA. He testified that this was not a new concept and that no one had ever "questioned the existence of the legal relationship which is reflected in that canon as preexisting the adoption of the canon. . . . [I]t states in my opinion exactly what the relationship was before the canon was introduced" and it dates "all the way back to 1789 when the Protestant Church was formed in this country. That has been the nature of the covenant relationship between the parishes and the National Church and the dioceses." Although Jones had great regard for the publication by Edwin White and Jackson Dykman,[15] and viewed it as an authoritative work on canons of PECUSA, he disagreed very strenuously with the suggestion found on page 310 of that text that the Dennis Canon was not declaratory or that it introduced a new concept. Jones testified that he could think of no one who held that view at the time of its adoption.

The Very Reverend James E. Annand, then dean of the Berkeley Divinity School at Yale University, stated that the hierarchical polity of the church allocates authority from the diocese down to the parish; that the bishop is the ecclesiastical authority with responsibility over the parishes; that there was no distinction in

---

[15] E. White & J. Dykman, Annotated Constitution and Canons for the Government of the Protestant Episcopal Church in the United States of America otherwise known as the Episcopal Church (1981).

the church's hierarchical polity or in the allocation of ultimate authority to the bishop as to spiritual matters and temporal matters; that parochial property in the church is held solely for the larger, overall mission of the church; that, dating back to 1789, the historical understanding in PECUSA was that parochial property is held in trust for PECUSA and the Diocese; and that the express trust provided in the Dennis Canon by the General Convention of PECUSA in 1979 was merely declarative of existing understandings within the church.

The defendants contend that because Trinity Church, a predecessor to Trinity-St. Michael's Parish, Inc., had been allowed to exercise discretion in the management and control of their property, they must be deemed to own it. The canons of the Diocese, however, are indicative of the bilateral and consensual relationship between the Diocese and a parish. While the property and business affairs of a parish are generally subject to the discretion, management and control of the vestry, the property of a parish may be acquired in the first place only for the purposes set forth in the canons: to support worship according to the doctrine and discipline of PECUSA and pursuant to the constitution and canons thereof. Indeed, as early as 1868, a church canon provided that it would be unlawful for any parish to encumber or alienate any dedicated consecrated church or chapel or any church or chapel that has been used solely for the divine service, without the previous consent of the bishop, acting with the advice and consent of the Standing Committee of the Diocese. See title II, canon 7, § 2.[16]

---

[16] Title II, canon 7, § 2 of the Episcopal canons provides in part: "It shall not be lawful . . . to encumber or alienate any dedicated and consecrated church or chapel . . . without the previous consent of the Bishop, acting with the advice and consent of the Standing Committee of the Diocese."

## B

Trinity Church was incorporated in Bridgeport on June 1, 1863. It was organized after various individuals from the city of Bridgeport sought the permission of the bishop to form a new Episcopal parish. At the time of incorporation, Trinity Church's members voted to associate themselves with the Diocese, and hence, PECUSA. Thereafter, the members of Trinity Church purchased land with their own funds and built a church on Broad Street in Bridgeport. Title to the property was taken in the name of Trinity Church. Trinity Church's articles of incorporation identified it with the Episcopal Church, stating that it desired to become a "body corporate" for the purpose of establishing and supporting the worship of God according to the doctrine and discipline of PECUSA, and asking for admission into union with the Episcopal Church and the Diocese of Connecticut.

In 1864, Trinity Church petitioned the bishop to consecrate its church building and agreed in writing with the Diocese to "preserve and defend the same from all unhallowed worldly and common uses."[17] Representatives of Trinity Church divested themselves of all ownership and right of control in and over the church building for any purpose other than that for which the church was consecrated. For the next sixty years, the members of Trinity Church worshipped at the Broad Street church.

---

[17] The significance of Trinity Church's articles of incorporation and the ceremony of consecration of the church edifice is that an Episcopal parish, from the outset, holds its property not for itself but for the larger purposes of PECUSA. The ceremony of consecration has more than just religious significance; the ceremony involves the dedication of a building for a particular purpose, namely the worship of services in the building according to the doctrine of the Episcopal Church. If the building is no longer used for that purpose, it is deconsecrated. Moreover, only after individuals wishing to form a parish represent to the diocese that they will hold their property in this way are they considered for admission into the diocese as a parish.

In 1924, Trinity Church relocated to Courtland Street in Bridgeport. The moneys used to purchase the land and fund the construction of the new church were advanced solely by the members of Trinity Church. Title to the church property was taken again in the name of Trinity Church. On January 6, 1926, the bishop consecrated the newly constructed church building in the same manner as the old building had been consecrated in 1864.

In 1955, the Diocese decided that it could no longer support St. Michael's Mission, another of its churches in Bridgeport, and began to look for a parish to accept that responsibility. When St. Michael's Mission had been first organized by the Diocese as a mission station in 1921, the church edifice had been consecrated. In the consecration ceremony, St. Michael's Mission had certified to the bishop that the church property had been secured for the use of those who profess and practice the doctrine and discipline of the Episcopal Church, and that the property was being consecrated "for the sole use of a congregation in communion with the Protestant Episcopal Church and under the spiritual jurisdiction of the Bishop of the Diocese of Connecticut."

In 1956, Trinity Church agreed to assume responsibility for St. Michael's Mission as a parochial mission upon the express condition that the property of St. Michael's Mission, which was then held by the Diocese, be transferred to Trinity Church.[18] The Diocese agreed to convey to Trinity Church all the property held by it for St. Michael's Mission, with the exception of one parcel of land. The single parcel not conveyed by the Diocese had previously been deeded to the Diocese in express trust for St. Michael's Mission. The Diocese

---

[18] The Missionary Society of the Diocese held title to the St. Michael's Mission property prior to 1956 because missions within the Diocese, unlike parishes, do not hold title to property.

apparently did not believe, at that time, that it could legally transfer title of the property to Trinity Church because of the trust. On March 2, 1956, the Missionary Society of the Diocese conveyed the St. Michael's Mission property located at 554 Tunxis Hill Road, Fairfield, to Trinity Church, subject to the restrictions that (1) the premises would be adequately maintained so long as St. Michael's Mission continued to exist on the premises and that if the congregation were disbanded or ceased to use the Mission, the Mission would be torn down, and (2) if the premises were sold, the proceeds of the sale would be given to the Missionary Society of the Diocese to be expended in the Bridgeport or Fairfield areas.

In 1960, the state of Connecticut began condemnation proceedings against Trinity Church's Courtland Street property. Trinity Church defended the condemnation action and was eventually awarded $1,077,000. Throughout the condemnation proceedings and in the years that followed, Trinity Church explicitly adhered to the dictates of the canons with respect to the sale of its property to the state of Connecticut, the request that it relocate to another site, the request that it ultimately be permitted to merge with St. Michael's Mission in the early 1970s, and its request to form Trinity-St. Michael's Parish. Additionally, the Trinity Church property in Bridgeport was deconsecrated and the ceremony of consecration that had taken place on January 6, 1926, was canonically annulled.

From 1966 through 1972, the members of Trinity Church worshipped at the church of St. Michael's Mission while they looked for a location on which to build a new church. In 1972, Trinity Church acquired additional property adjacent to St. Michael's Mission with its own funds in its own name, and without prior approval of the bishop and the Standing Committee of the Diocese. In 1972, Trinity Church received consent

from the bishop and the Standing Committee of the Diocese to relocate permanently to St. Michael's Church, effectively terminating the separate existence of St. Michael's Mission. The Diocese agreed to convey to Trinity Church the title to the one parcel of property that it had continued to hold in trust for St. Michael's Mission and also agreed to petition the Missionary Society of the Diocese to release certain restrictions contained in the March 2, 1956 deed to Trinity Church. When Trinity Church and St. Michael's Mission combined and formed Trinity-St. Michael's Parish in 1973, the church edifice was consecrated according to the same ceremony as described above. Representatives of Trinity-St. Michael's Church agreed with the Diocese as part of the consecration ceremony to separate their church from all worldly and common uses and to dedicate it to the purpose of worship and service according to the provisions of PECUSA.

Thereafter, Trinity Church invested approximately $260,000 of its endowment fund into the remodeling of St. Michael's Mission's buildings, and Trinity Church became known as Trinity-St. Michael's Parish. In 1974, a trust agreement between Trinity-St. Michael's Parish and the endowment committee of the Diocese was executed, creating a trust fund known as the Bishop-Booth-Spooner endowment fund. (Spooner fund). By the terms of the trust agreement, if Trinity-St. Michael's Parish should cease to exist under the laws of the state of Connecticut, the proceeds of the trust fund would be divided among the fifty poorest Episcopal parishes in the state of Connecticut.[19]

[19] The trial testimony of Eugene Dardani, who was, in 1974, Junior Warden of Trinity-St. Michael's Parish, and Thomas Dardani, the lawyer who drafted the trust document, was instructive as to the reversionary clause in favor of the fifty poorest Episcopal parishes in the Diocese. Both testified that the purpose of the reversionary language in the trust agreement was not to keep the corpus of the trust away from the Diocese, but rather to pass the funds to the benefit of the Diocese so it could assist the poorest Episcopal parishes in the Diocese.

Between 1969 and 1979, Trinity-St. Michael's Parish and its predecessors requested the bishop's permission to build a new church on property it had acquired on Black Rock Turnpike in Fairfield, which was denied. In 1971, the bishop denied Trinity Church's request to sell the Black Rock Turnpike property. The parish did not sell its property until 1979, when the bishop finally gave permission for the sale provided that the proceeds of such sale be deposited into a trust fund with terms similar to those of the Spooner fund. The parish promptly formulated the Racioppi trust fund agreement, which was established for the benefit of Trinity-St. Michael's Parish and the Diocese in accordance with the canons of PECUSA. The trust agreement required that in the event that Trinity-St. Michael's Parish ceased to exist as a parochial organization, the trust property was to be distributed to the fifty poorest parishes of the Diocese, as determined by the Missionary Society of the Diocese.

The disaffection of Trinity-St. Michael's Parish that ultimately led to its secession from the Diocese and PECUSA began with the appointment of Father Ross Baxter as rector in 1979. Because Baxter could not resolve his feelings about certain changes in the church liturgy made in 1979 he began, in 1985 and 1986, to transfer moneys from the Spooner fund in order to remove such moneys from the control, or the claim of control, of the Diocese in what he perceived to be an impending lawsuit.[20]

On May 2, 1984, a majority of the members of Trinity-St. Michael's Parish voted to incorporate pur-

---

[20] The trial court could reasonably have found that these admissions by Baxter, through his conduct, indicated his perception that the Diocese would have superior rights to the trust fund's interest in the event of a lawsuit. He acknowledged that the disposition of the corpus of the Spooner fund for purposes other than those of the church would "violate the canons of the Episcopal Church."

suant to the Connecticut Nonstock Corporation Act,
General Statutes § 33-419 et seq., under the name
"Trinity-St. Michael's Parish, Inc.," and the corpora-
tion was formed on May 9, 1984. Trinity-St. Michael's
Parish, Inc., was not then, and presently is still not,
organized under the Religious Corporation Act, Gen-
eral Statutes § 33-264d. The membership provisions of
the corporation, which limited membership to persons
who essentially did not accept the then current doctrine
of the church, violated both state law as to member-
ship in PECUSA; General Statutes § 32-266; and the
membership provisions of PECUSA.

In the summer of 1986, Baxter resigned as rector of
Trinity-St. Michael's Parish, Inc., after having been
"defrocked" by the bishop. Ignoring the bishop's selec-
tion of a new rector, the incorporated parish instead
elected the Reverend Rocco A. Florenza as rector. On
November 30, 1986, members of Trinity-St. Michael's
Parish, Inc., voted forty-six to twelve to leave PECUSA
and join the Diocese of Christ the King, which at the
time was a member of the Anglican Catholic Church.
Neither the Diocese of Christ the King nor the Angli-
can Catholic Church is affiliated with PECUSA. Fol-
lowing this vote, several members of Trinity-St.
Michael's Parish, Inc., who did not agree with the
majority, began to worship at the Golden Hill Method-
ist Church in Bridgeport, where they continue to wor-
ship today. Shortly after Trinity-St. Michael's Parish,
Inc., severed its relationship with the Diocese, these
cross actions for declaratory judgments were brought
seeking a determination as to the ownership of certain
real and personal property in the possession of Trinity-
St. Michael's Parish, Inc.[21]

---

[21] Record title to the real property at issue in this case is held by the Dio-
cese and two entities expressly affiliated with PECUSA. The three record
owners are as follows: the Parish of Trinity Church owns lots Nos. 38, 39,
40, 41, 42, 44 and 45; the Missionary Society of the Diocese owns lot No. 43;

In addition to all the evidence set forth thus far, the trial court heard other evidence upon which it relied to conclude that between 1863 and November 30, 1986, Trinity-St. Michael's Parish, Inc., and its predecessors had a relationship with the Diocese and PECUSA that unqualifiedly and unambiguously manifests the acceptance of their role in, and relationship to, the Diocese and PECUSA within its hierarchical polity. For example, Trinity-St. Michael's Parish, Inc., and each of its predecessors came into existence only with the canonical permission of the bishop. In May, 1863, when the bishop objected to the formation of the parish of Trinity Church, the parish could not, and did not, come into being until permission of the bishop was obtained. In 1892, although Trinity Church wanted to relocate, it refrained from doing so because the bishop "forbade the change of location." In 1893, the bishop conditioned his consent to a sale by Trinity Church of its church building upon a caveat that it not be used for secular purposes. In 1923, Trinity Church sought the permission of the bishop before relocating. In 1924, Trinity Church sold its property on Fairfield Avenue and Broad Street, Bridgeport, but only after first seeking the permission and receiving the consent of the bishop.[22]

---

and the Episcopal Society of Trinity Church owns lot Nos. 46 through 49. Whether a parish holds record title, however, is not dispositive of whether a trust agreement exists.

As Bishop Walmsley testified at trial, the fact that within the Episcopal Church parishes typically hold title to their property does not in any way diminish the fabric of the Church's hierarchical polity. As Walmsley explained, a parish's property is dedicated and consecrated for the purposes that are outlined in the service of consecration and the parish is brought into being exclusively for the worship of the church according to its doctrine and disciplines. Only after individuals wishing to form a parish represent to the diocese that they will hold their property in this way are they considered for admission into the diocese as a parish.

[22] Although there were other instances of Trinity Church selling and purchasing property without prior approval of the bishop or the Standing Committee of the Diocese, the trial court acted within the proper exercise

Trinity-St. Michael's Parish, Inc., has acknowledged its role in PECUSA and the Diocese in numerous other ways. For the majority of the years between 1863 and 1984, moreover, Trinity-St. Michael's Parish, Inc., and its predecessors presented annual reports to the Diocese regarding the parish's financial condition. Between 1864 and 1984, Trinity-St. Michael's Parish, Inc., and its predecessors sent clerical and lay delegates to the annual convention of the Diocese. Furthermore, for the majority of the years between 1863 and 1986, Trinity-St. Michael's Parish, Inc., and its predecessors paid their assessment and proportionate share to the Diocese as required by the canons.

## III

On the basis of this evidentiary record, the trial court found that Trinity-St. Michael's Parish, Inc., and its predecessor churches, Trinity Church and St. Michael's Mission, were ecclesiastical organizations in union with the Diocese and PECUSA and had conducted their affairs for 123 years substantially in accordance with the constitution and the canons of the Diocese and of PECUSA. That conclusion finds ample support in the uncontradicted showing that Trinity-St. Michael's Parish, Inc., and its predecessors had agreed, as a condition to their formation as ecclesiastical organizations affiliated with the Diocese and PECUSA, to use and hold their property only for the greater purposes of the church.

The evidence at trial overwhelmingly established that the Dennis Canon adopted in 1979 merely codified in explicit terms a trust relationship that has been implicit in the relationship between local parishes and dioceses

of its discretion by giving greater deference to the evidence that demonstrated strict compliance with the requirements of canonical law. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 220–21, 435 A.2d 24 (1980).

since the founding of PECUSA in 1789. See, e.g., *Bishop & Diocese of Colorado* v. *Mote,* 716 P.2d 85, 105 (Colo.), cert. denied, 479 U.S. 826, 107 S. Ct. 102, 93 L. Ed. 2d 52 (1986).[23] As was made clear at trial, the panoply of constitutional and canonical provisions of PECUSA and the Diocese "strongly indicate that the local church property was to be held for the benefit of the general church, and . . . show the extensive nature of the policy direction and property control to be exercised by the general church." Id., 104. PECUSA is and always has had a hierarchical polity within which the constitution and canons of PECUSA and the Diocese govern the life of the local parishes. The courts of this state and many other jurisdictions have uniformly acknowledged these defining principles of the Episcopal polity. See, e.g., *Christ Church* v. *Trustees,* 67 Conn. 554, 568, 35 A. 552 (1896); *Bishop & Diocese of Colorado* v. *Mote,* supra, 104–105; *Duncan* v. *Watterson,* Docket No. 77-3926 CA(L)01k, slip op. p. 9 (Fla. Cir. Ct., Feb. 21, 1979); *Protestant Episcopal Church* v. *Graves,* 83 N.J. 572, 578, 417 A.2d 19 (1980), cert. denied sub nom. *Moore* v. *Protestant Episcopal Church,* 449 U.S. 1131, 101 S. Ct. 954, 67 L. Ed. 2d 119 (1981); *Church of the Ascension* v. *Diocese of Newark,* Docket No. C-16372-88E, slip op. p. 10 (N.J. Sup. Ct. Ch. Div., Feb. 1, 1989); *Tea* v. *Protestant Episcopal Church,* 96 Nev. 399, 402, 610 P.2d 182 (1980).

---

[23] The only evidence relied upon by the defendants for the proposition that the Dennis Canon created a radical departure from existing doctrine is the publication by Edwin White and Jackson Dykman; see footnote 15; which the trial court was free to reject, particularly in light of the testimony of the plaintiffs' four experts to the contrary. The defendants have also pointed to a handful of cases from other jurisdictions in support of their position that the other canons providing limitations on the alienation of property did not create an implicit trust. See *York* v. *First Presbyterian Church,* 130 Ill. App. 3d 611, 474 N.E.2d 716 (1984), cert. denied, 474 U.S. 865, 106 S. Ct. 183, 88 L. Ed. 2d 152 (1985); *Foss* v. *Dykstra,* 342 N.W.2d 220 (S.D. 1983). All the expert witnesses testified, however, that the canons did create an implicit trust.

The trial court's review of the applicable constitutions and canons of PECUSA and the Diocese as well as the historical relationship between the parish and the Diocese demonstrates the type of relationship found determinative of diocesan control by these other state courts. See, e.g., *Bishop & Diocese of Colorado* v. *Mote, supra; Protestant Episcopal Church* v. *Graves, supra.* The expert witnesses of the Diocese placed these canons in historical context, further establishing the trust relationship between the local parishes and the Diocese as a central element of Episcopal polity and practice.

We concur in the conclusion of the trial court that the evidence produced at trial established the existence of a legally enforceable trust in favor of the general church in the property claimed by the defendants.

The judgments are affirmed.

In this opinion the other justices concurred.

