## THE EPISCOPAL CHURCH IN THE DIOCESE OF CONNECTICUT ET AL. *v.* RONALD S. GAUSS ET AL.
### (SC 18719)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan and Eveleigh, Js.

Argued February 9—officially released October 11, 2011

*James H. Howard*, with whom was *Howard M. Wood III*, for the appellants (named defendant et al.).

*Alan Robert Baker*, with whom were *Michelle M. Seery* and, on the brief, *David Booth Beers* and *Mary E. Kostel*, pro hac vice, for the appellees (plaintiffs).

*Opinion*

ZARELLA, J. In this property dispute between members of a local parish and the church with which they were affiliated, the named defendant, Ronald S. Gauss,[1]

---

[1] Reverend Gauss served as an active, ordained priest of the Protestant Episcopal Church in the United States of America and as rector of Bishop Seabury Church prior to his retirement on December 1, 2007.

and twelve other defendants who are present or former officers or vestry members of Bishop Seabury Church[2] (Parish) and hold themselves out as continuing to serve in that capacity,[3] appeal from the trial court's granting of summary judgment and declaratory and injunctive relief in favor of the plaintiffs, The Episcopal Church in the Diocese of Connecticut (Diocese), the Reverend Canon David Cannon,[4] the Parish and The Protestant Episcopal Church in the United States of America (Episcopal Church),[5] following a decision by a majority of the voting members of the Parish, including the defendants, to withdraw from the Diocese and to affiliate the Parish with the Convocation of Anglicans of North America (CANA), an ecclesiastical society that is not part of the Episcopal Church or the Diocese. The defendants claim that the trial court improperly (1) granted summary judgment in favor of the plaintiffs and declared that the real and personal property[6] of the

---

[2] Bishop Seabury Church is a parish of the Episcopal Church in the Diocese of Connecticut.

[3] The twelve present or former officers and vestry members are Richard Vanderslice, Arthur H. Hayward, Jr., Stanley Price, Deborah Gaudette, Kathy Tallardy, Barbara Stiles, Marion Ostaszewski, Shelley Steendam, Amy Ganolli, Debra Salomonson, James Conover and Everett Munro. The defendants stated in their objection dated April 14, 2010, to the plaintiffs' motion for an order of accounting that only five of the defendants "remain on the vestry."

Former Attorney General Richard Blumenthal also was named as a defendant because of his "interest in the protection of any gifts, legacies or devises intended for public or charitable purposes"; General Statutes § 3-125; and he appeared in the case, but neither he nor his successor has participated in the litigation to date. In the interest of simplicity, we refer to Gauss and the twelve former or present officers and vestry members as the defendants.

[4] Cannon was appointed "[p]riest in [c]harge" of Bishop Seabury Church by the Bishop of the Diocese of Connecticut on February 29, 2008.

[5] The Episcopal Church joined this action as a plaintiff by way of a motion to intervene filed on June 6, 2008, which was granted on June 24, 2008.

[6] In its memorandum of decision, the trial court described the real property of the Parish as "the land and the improvements thereon located at 256 North Road, Groton, Connecticut, described in the complaint as being evidenced by (1) the warranty deed to Bishop Seabury Church dated July 7, 1966, and recorded in the land records of the town of Groton . . . and (2) the quitclaim

Parish was held in trust for the Episcopal Church and the Diocese, and that the defendants had no right, title, interest or authority to occupy, use or possess the property, (2) ordered the defendants to relinquish possession, custody and control of the property to the plaintiffs, (3) permitted the plaintiffs to move for an order of accounting, and (4) found the defendants in contempt for failing to comply with the order of accounting. The plaintiffs reply that the trial court properly granted summary judgment in their favor, granted their motion for an order of accounting, and found the defendants in contempt. We dismiss as moot the defendants' claim regarding the finding of contempt and affirm the judgment of the trial court in all other respects.

## I

### SUMMARY JUDGMENT MOTIONS

The defendants claim that the trial court improperly granted the plaintiffs' motion for summary judgment because there were genuine issues of fact as to whether the polity of the Episcopal Church is hierarchical and whether Parish members ever had intended or agreed to hold Parish property in trust for the Episcopal Church and the Diocese. The defendants also claim that the trial court improperly relied on *Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Connecticut*, 224 Conn. 797, 620 A.2d 1280 (1993) (*Trinity-St. Michael's Parish*), and improperly rejected their special defenses in concluding that the Episcopal Church and the Diocese

deed to Bishop Seabury Episcopal Church dated August 11, 1966, and recorded in the land records of the town of Groton . . . ."

The trial court described the personal property of the Parish as "all the other property owned or possessed by . . . Bishop Seabury [Church], including the Parish records, reports, vestry minutes, books, bank accounts, trust accounts, equipment, computers, furniture, furnishings and objects used in the worship and the administration of the [Parish's] sacraments."

held an implied trust interest in the property. The plaintiffs respond that the trial court properly granted their motion for summary judgment because there was no triable issue as to whether the polity of the Episcopal Church is hierarchical or whether the Episcopal Church or the Diocese held an implied trust interest in the property. They further argue that the court properly relied on *Trinity-St. Michael's Parish* in concluding that the Episcopal Church is hierarchical and properly rejected each of the defendants' special defenses as a matter of law.

With respect to the applicability of the Dennis Canon,[7] which the parties discussed in supplemental briefs filed at this court's request, the parties disagree as to whether it applies to resolve the issues in this case. Having considered the parties' arguments, we now conclude under neutral principles of law that the Dennis Canon applies and that it clearly establishes an express trust interest in the property in favor of the Episcopal Church and the Diocese. Accordingly, we affirm the trial court's judgment on that ground.

## A

## Facts

The following relevant undisputed facts are set forth in the trial court's memorandum of decision. "In 1875, the Right Reverend John Williams, then bishop of the Diocese, organized the Bishop Seabury Church as a mission with the consent of the Diocese's Standing Committee. The first church building was constructed the same year and consecrated thereafter by [Reverend] Williams under the name of 'Bishop Seabury Memorial Church,' in honor of the first bishop of the Episcopal Church and of the Diocese . . . . .

---

[7] An in-depth discussion of the Dennis Canon is contained in part I C 2 of this opinion.

"In 1956, the Bishop Seabury Memorial Church sought to be constituted as an official parish admitted into union with the Diocese in a manner conforming with the requirements set forth in Diocesan canon I. Accordingly, the executive committee and members of the Bishop Seabury Memorial Church mission congregation reviewed the canonical requirements for becoming a parish and, on February 20, 1956, resolved to pursue the necessary means for admission. Four days later, the Bishop Seabury Memorial Church sent its official written request for permission to form as a parish to then bishop Walter [Henry] Gray. On April 28, 1956, [Bishop] Gray constituted Bishop Seabury Memorial Church as a parish and directed [it] to complete the forms necessary for formal admission into union with the Diocese per Diocesan canon I.2. Notably, the first of these required documents was a 'form of organizing the Parish,' which [provides] in relevant part: 'We the subscribers . . . do hereby unite to form and do hereby form ourselves and our successors into an [e]cclesiastical [s]ociety . . . under the [c]onstitution and [c]anons of the . . . Diocese . . . for the purpose of supporting the [w]orship of Almighty God according to the [d]octrine, [d]iscipline and [l]iturgy of said [c]hurch in these United States . . . .'

"After the Parish's completion of the necessary forms, and their subsequent approval by the Diocesan Standing Committee and Committee on Admission of New Parishes, the Parish was officially admitted into union with the Diocese at its [one hundred seventy-second] annual convention on May 15, 1956. Thereafter, in July of 1956, the Missionary Society of the Diocese quitclaimed the Bishop Seabury Memorial Church property to the Parish in 'three pieces.' The third piece of said property was located at 808 Eastern Point Road in Groton, Connecticut (Eastern Point Road property). This property on Eastern Point Road would serve as

the Parish rectory. The following is a summary of the subsequent, relevant real estate transactions leading up to the commencement of the instant litigation.

"In September of 1963, the Parish held a special meeting in which members voted to purchase a piece of property on Hazelnut Hill in Groton, Connecticut (Hazelnut Hill property). The following month, the Parish sought and obtained approval from the Diocese to acquire a loan to finance this purchase.

"In 1965, the Parish sought and received the consent of the Bishop and Standing Committee to sell the Eastern Point Road property to purchase a lot for use as a new rectory at 121 Maxson Road Extension, which would later be renamed Azalea Drive, in Groton, Connecticut (Azalea Drive property). In accordance with its agreement with the Diocese, the purchase was funded by the proceeds from the sale of the Eastern Point Road property and a purchase-money mortgage on the Azalea Drive property. In its correspondence with the Diocese, the Parish expressly acknowledged its canonical obligation to obtain the permission of the Bishop and Standing Committee to enter into these transactions.

"In 1966, the Parish sought and received permission from the Diocese to acquire property on North Road (North Road property) in order to construct a new church facility. The North Road property was to be acquired in two adjacent parcels—the first as a gift from . . . Robert Graham, and the second by purchase. In order to finance the purchase of the second parcel, the Parish sought and received the Diocese's express permission to remortgage the Azalea Drive property and sell the Hazelnut Hill property. After obtaining the consent of the Bishop and Standing Committee, the Parish took title to the two adjacent parcels in July and August of 1966, respectively. The North Road property

currently serves as the Parish's primary place of worship.

"In 1967, the Parish sought permission from the Diocese to sell the remaining 'two pieces' of property it acquired from the Missionary Society of the Diocese in 1956, contingent [on] the Parish's relocation to its new facility on the North Road property. With the consent of the Standing Committee, the Bishop granted permission to this requested sale with the express understanding that (1) the Parish would retain exclusive use of the properties to be sold until a new place of worship could be erected, and (2) after the last church service, all Christian symbols would be removed, and the church would be secularized or unconsecrated. In compliance with the Bishop's directive, the new church was constructed, and, on March 3, 1968, the Parish's former church building was secularized by the Suffragan Bishop of Connecticut, John [Henry] Esquirol, who pronounced the property 'unconsecrated and no longer within . . . canonical jurisdiction.'

"In April of 1983, the Parish sought the Diocese's permission to sell the Azalea Drive property, acknowledging that the request was governed by the 'Diocese memorandum entitled Administration/Finance-360, Procedures for Real Estate Sales of Encumbrances.' The Diocese consented to the transaction, and, in consideration of the fact that this property was used as the rectory, its consent was conditioned on the requirement that the Parish invest the proceeds and use any dividends or interest to pay the rector a housing allowance.

\* \* \*

"On October 29, 2007 . . . [Reverend] Gauss, then-rector of the Parish, submitted an application for retirement to the church pension fund, indicating his intention to retire from active ministry on December 1, 2007. Bishop Andrew Smith approved the application on

November 13, 2007, whereupon [Reverend] Gauss' retirement became effective, and he began drawing retirement benefits from the pension fund. . . . On November 14, 2007, one day after [Reverend] Gauss' retirement became effective, the defendants [Richard] Vanderslice and [Arthur H.] Hayward, [Jr.] purporting to write on behalf of the Parish's wardens and vestry, informed the Bishop by letter that 'the Parish [had] affiliated itself with [CANA].' CANA, which publically purports to be a mission of the Anglican Church of Nigeria, is not a part of the Episcopal Church or [the] Diocese.

"Subsequently, on January 10, 2008, having determined that all the . . . wardens and vestry members of the Parish had aligned themselves with CANA and away from the [Diocese and the] Episcopal Church, [Bishop] Smith removed each defendant from their respective position at the Parish, notifying them of his actions in writing. The Bishop furthermore demanded that the defendants relinquish their possession and use of the subject property, to which the latter refused.

"On February 29, 2008, pursuant to Episcopal Church canon III.9.3, [Bishop] Smith appointed . . . Reverend Cannon as priest in charge of the Parish and remanded members who wished to remain affiliated with the Episcopal Church to his care. [Reverend] Cannon's demands to be given the use and possession of the . . . property, however, have been refused by the defendants . . . ."

Shortly thereafter, "the plaintiffs initiated this action by [filing] a one count complaint alleging a breach of trust based on the claim that the defendants wrongfully [had] failed to relinquish the subject property after realigning themselves with a different religious organization. The plaintiffs [sought] (1) a declaration from [the trial] court that the disputed Parish property [was] held in trust for the Episcopal Church and [the] Diocese,

and (2) an injunction prohibiting the . . . defendants from their continued use of, or assertion of any rights to, the subject property.

"On July 1, 2009, the defendants filed their answer along with fifteen special defenses and a counterclaim 'for construction of the alleged trust.' In the special defenses, the defendants contend[ed] that the plaintiffs' claims [were] barred because (1) the first amendment to the United States constitution, as well as article seventh and article first, § 3, of the constitution of Connecticut preclude[d] [the trial] court from resolving ecclesiastical questions such as the present issue concerning church polity, (2) the plaintiffs' claims [had] been extinguished by the Marketable Title Act, General Statutes [§] 47-33b [et seq.], (3) the doctrine of laches applie[d], (4) the statute of frauds applie[d], (5) General Statutes § 33-265, which governs the legal status and powers of ecclesiastical societies in communion with the Protestant Church, is unconstitutional, (6) agreements between the Parish and [the] Diocese regarding the subject property, if any, were merged into the deeds, which list the [Parish] as the unqualified sole owner, (7) the Diocese waived its right to any interest in the subject property when it conveyed the same to the Parish, (8) Connecticut courts 'do not recognize or impose resulting trusts against nonprofit charitable religious associations,' (9) the action [was] untimely pursuant to General Statutes § 52-576, (10) the Diocese lack[ed] the authority, without the affirmative consent of its members, to pursue this action, and, thus, any prosecution of the same [was] an ultra vires act, (11) the Episcopal Church similarly lack[ed] the requisite authority to pursue this action, (12) the alleged trust [was] void for uncertainty because it [did] not sufficiently state its charitable purposes or the charitable organizations to be benefited in order to control the 'conscience of a trustee,' (13) all of the defendants, with

the exception of [Reverend] Gauss, served as volunteers for the Parish and, as such, [were] immune from liability for any of the acts or omissions alleged by the plaintiffs pursuant to 42 U.S.C. § 14503 and General Statutes § 52-446m, (14) any trust over the subject property in favor of the Diocese or [the] Episcopal Church '[had] been revoked by the settlors by unanimous vote of the present and voting members of the [Bishop Seabury Church] Society,' and (15) '[t]he constitutions and canons the plaintiffs claim[ed] [had] establish[ed] their interest in the [subject] property . . . were created by the collusive acts of Bishops and dioceses and not by acts of [the Parish]' and, therefore, should not be considered binding [on] the defendants.

"In the counterclaim, the defendants [sought] the following declarations regarding any implied trust that [might] be found to exist: (1) The present and former members of [the Parish were] the donors [or] settlors of any trust; (2) the elected vestry [members were] the trustees of the trust during their terms in office; (3) the purpose of the trust [was] the propagation of the gospel in accordance with the historic faith and order; and (4) the beneficiaries of the trust [were] those individuals, entities and ministries selected by the trustees to fulfill the purpose of propagating the gospel in accordance with the historic faith and order. The defendants also [sought] a declaration from the court regarding 'the nature and priority of the beneficial interests, if any, of the members of the [Parish], the Diocese and the Episcopal Church.'

"On July 31, 2009, the plaintiffs filed a . . . motion for summary judgment, arguing that, [because the Parish is] a subordinate unit within the hierarchy of the Episcopal Church, all of the Parish's property was held in trust for the mission of the Episcopal Church and [the] Diocese, and should have been relinquished when members of the Parish chose to affiliate with a different

religious organization. In response, the defendants argue[d] that (1) the polity of the Episcopal Church is not hierarchical, (2) the claim of implied trust is not supported by the law or facts of the present case, and (3) their special defenses preclude[d] the court from granting the plaintiffs' motion for summary judgment.

"On October 15, 2009, the defendants filed a . . . cross motion for summary judgment. In support of this motion, the defendants reiterate[d] the arguments asserted in their first and second special defenses that the plaintiffs' claims fail[ed] as a matter of law because the court [was] without the authority to adjudicate matters of church polity and [the] claims [were] barred by the Marketable Title Act.

"The plaintiffs filed a memorandum in opposition to the defendants' motion for summary judgment on October 30, 2009. Oral argument on both motions was heard by the [trial] court on December 16, 2009."

On March 15, 2010, the trial court granted the plaintiffs' motion for summary judgment, denied the defendants' motion for summary judgment and rendered judgment for the plaintiffs. In its memorandum of decision, the court first determined that the parties' dispute could be adjudicated without considering substantive issues of religious faith. It then concluded that an implied trust over the subject property existed in favor of the plaintiffs. In reaching this conclusion, the court found that the Episcopal Church was a hierarchical, religious organization and that the canons and constitutions of the Episcopal Church and the Diocese evidenced the existence of an implied trust over the Parish property in favor of the plaintiffs. After rejecting the defendants' special defenses, the court declared that the Parish property was held in trust for the Episcopal Church and the Diocese and that the defendants had no right, title, interest or authority to occupy, use or

possess the property. The court also ordered injunctive relief[8] and permitted the plaintiffs to move for an order of accounting within sixty days. This appeal followed.[9]

## B

### Applicable Law

The principles that govern our review of a trial court's ruling on a motion for summary judgment are well established. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Weiss* v. *Weiss*, 297 Conn. 446, 458, 998 A.2d 766 (2010).

In ruling on a motion for summary judgment, "the court's function is not to decide issues of material fact

[8] The trial court (1) ordered the defendants to relinquish possession, custody and control of the disputed property to the plaintiffs immediately, (2) prohibited the defendants from continuing to use or assert any rights to the disputed property, (3) ordered the defendants and all others acting under their control or direction not to interfere with the plaintiffs' right to immediate possession, custody and control of the disputed property, and (4) enjoined the defendants and all others acting under their control or direction from wasting, selling, transferring, conveying or encumbering any of the disputed property.

[9] The defendants appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. The appeal was amended twice, and simultaneous supplemental briefs were filed in accordance with this court's request to address the following question: "Assuming we apply the neutral principles of law approach set forth in *Jones* v. *Wolf*, 443 U.S. 595 [99 S. Ct. 3020, 61 L. Ed. 2d 775] (1979), should this court apply the Dennis Canon to resolve the issues in this case?"

. . . but rather to determine whether any such issues exist." *Nolan* v. *Borkowski*, 206 Conn. 495, 500, 538 A.2d 1031 (1988). "The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact." (Internal quotation marks omitted.) *Zielinski* v. *Kotsoris*, 279 Conn. 312, 318, 901 A.2d 1207 (2006). "Once the moving party has met its burden [of production] . . . the opposing party must present evidence that demonstrates the existence of some disputed factual issue." (Internal quotation marks omitted.) *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 46–47, 881 A.2d 194 (2005). "[I]t [is] incumbent [on] the party opposing summary judgment to establish a factual predicate from which it can be determined, as a matter of law, that a genuine issue of material fact exists. . . . The presence . . . of an alleged adverse claim is not sufficient to defeat a motion for summary judgment." (Citation omitted; internal quotation marks omitted.) *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 247, 618 A.2d 506 (1992).

On appeal, the reviewing court "must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court. . . . [R]eview of the trial court's decision to grant [a party's] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Weiss* v. *Weiss*, supra, 297 Conn. 458.

With respect to the governing legal principles, two United States Supreme Court decisions have long guided civil courts in resolving church property disputes so as to avoid becoming entangled in first amendment issues. In *Watson* v. *Jones*, 80 U.S. (13 Wall.) 679, 722–23, 20 L. Ed. 666 (1871), the court stated that issues that come before civil courts concerning the property

rights of ecclesiastical bodies fall into three classes. "The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief." Id., 722. In such cases, the court must uphold the express terms of the trust. See id., 723–24. The second consists of cases in which "the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." Id., 722. Disputes falling within this class are to be resolved under "the ordinary principles which govern voluntary associations," such as majority rule. Id., 725. The third class of cases includes those in which "the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there [is a] superior ecclesiastical [tribunal] with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." Id., 722–23. "[I]n cases of this character [civil courts] are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." Id., 726–27. In other words, civil courts must examine the polity[10] of the general church to determine whether it is hierarchical, and, if they determine

[10] The term "polity" refers to "the particular system of church government upon which church members have agreed, including the structural allocation of authority within the church and the established procedures for resolving internal disputes." *Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Connecticut*, supra, 224 Conn. 804 n.8.

that it is, the decision of the higher authorities within the church must be respected.

Approximately 100 years later, the Supreme Court considered and approved a second approach for the settlement of church property disputes. See generally *Jones* v. *Wolf*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979). The question before the court was "whether civil courts, consistent with the [f]irst and [f]ourteenth [a]mendments to the [United States] [c]onstitution, may resolve [disputes over church property following a schism in a local church affiliated with a hierarchical church] on the basis of 'neutral principles of law,' or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church." Id., 597. In answering that question, the court emphasized that the first amendment "does not dictate that a [s]tate must follow a particular method of resolving church property disputes. Indeed, a [s]tate may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." (Emphasis in original; internal quotation marks omitted.) Id., 602. The court then suggested that such disputes could be resolved on the basis of neutral principles of law by examining the deeds to church property, local church charters, state statutes governing the holding of church property and the constitution and canons of the general church for language concerning the ownership and control of church property. See id., 603–604. The court explained that this approach, unlike the deferential approach articulated in *Watson*, "obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine in settling church property disputes"; id., 605; and that its advantages included that it was "completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objec-

tive, well-established concepts of trust and property law familiar to lawyers and judges." Id., 603. The United States Supreme Court thus recognized in *Watson* and *Jones* two equally valid, but mutually exclusive, methods for resolving church property disputes involving hierarchical churches without requiring civil courts to become impermissibly entangled in religious doctrine. There has been no significant case since *Jones* in which the court has addressed a similar question or articulated a third approach.[11]

One year after *Jones*, this court stated in *New York Annual Conference of the United Methodist Church* v. *Fisher*, 182 Conn. 272, 438 A.2d 62 (1980) (*New York Annual Conference*), that the principle of compulsory deference to ecclesiastical authority set forth in *Watson* must be applied "in accommodation with the competing principle" articulated in *Jones* that the state has an interest in providing a civil forum for the settlement of church property disputes under neutral principles of law. Id., 281. We initially acknowledged that the "basic rules" laid down in *Watson* established a "two-stage test" under which a court first must determine whether the property is dedicated by way of an express trust to the general or local church. See id., 282. In the absence

---

[11] After *Jones*, state courts appeared to choose between the two United States Supreme Court methodologies. Currently, twenty states and the District of Columbia follow the neutral principles of law approach, nine states follow the hierarchical approach, eight follow a hybrid of the two approaches and thirteen are undecided, apparently because they have not been presented with the issue. See J. Hassler, comment, "A Multitude of Sins? Constitutional Standards for Legal Resolution of Church Property Disputes in a Time of Escalating Intradenominational Strife," 35 Pepp. L. Rev. 399, 457–63 (2008) (survey current through 2008); see also *Episcopal Church Cases*, 45 Cal. 4th 467, 485, 198 P.3d 66, 87 Cal. Rptr. 3d 275 (deciding in 2009 to adopt neutral principles of law approach), cert. denied sub nom. *Rector, Wardens & Vestrymen of Saint James Parish in Newport Beach, California* v. *Protestant Episcopal Church in the Diocese of Los Angeles*, 558 U.S. 827, 130 S. Ct. 179, 175 L. Ed. 2d 41 (2009). Connecticut falls within the small group of states that have adopted a hybrid approach. J. Hassler, supra, 458.

of an express trust, the court must examine the church polity to determine whether the local church is a subordinate member of the general church. See id. If the local church is not subordinate, rights to the property are to be decided under the legal principles that govern voluntary associations. *Watson* v. *Jones*, supra, 80 U.S. (13 Wall.) 724–25; see *New York Annual Conference of the United Methodist Church* v. *Fisher*, supra, 282. If the local church is subordinate, rights to the property are to be determined by the superior tribunal within the hierarchical church. *New York Annual Conference of the United Methodist Church* v. *Fisher*, supra, 282. We then noted that *Jones* had "added to the rules of [*Watson*] by enlarging the scope of inquiry that a court may pursue . . . to determine the existence of a trust . . . and, presumably, the polity of a church and a local church's affiliation therewith. Under [*Jones*] . . . civil courts may not only examine the deeds of conveyance or of trust but may also scrutinize certain religious documents, such as a church constitution, for language of trust in favor of the general church." Id., 282–83.

Fourteen years later, we observed in *Trinity-St. Michael's Parish* that *Watson* and *Jones* represented "somewhat different approach[es]"; *Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Connecticut*, supra, 224 Conn. 802; but that *New York Annual Conference* had determined that the two United States Supreme Court cases "should be read to complement one another." Id., 804. In the absence of an express trust, "the court must determine whether an implicit trust exists in favor of the general church. In conducting this inquiry, the court must examine the polity of the church, in addition to the church constitution and its canons, for language of trust in favor of the general church." Id. In other words, the trial court would be required to determine "whether there was . . . an implied trust. Where the nature of

the relationship may . . . be judicially determined by reference to the polity of the church, by its constitution and canons, and by the clear factual evidence regarding the historical subordinate relationship between the local church and the general church, there is no reason for a court not to enforce the terms of that relationship. If a trust has been implicitly acknowledged by the parties and is embodied in some legally cognizable form, it must be respected." Id., 806. Accordingly, under the two Connecticut decisions, civil courts must examine the polity of the general church, *as well as* the deed, church documents and applicable state statutes, under neutral principles of law for language of trust in favor of the general church. We now conclude that combining the two standards imposes an unnecessary burden on the parties and the courts.

Under *Watson*, a court searches for evidence regarding the polity, or structural authority, of the general and local churches to determine whether the local church is a subordinate member of the general church. *Watson* does not incorporate the concept of a trust in church property, except insofar as the instrument of conveyance indicates that the property must be devoted to the teaching of a specific religious doctrine. See *Watson* v. *Jones*, supra, 80 U.S. (13 Wall.) 722, 723. *Watson* also does not require the court to search church documents for language suggesting that the local church holds property in trust for the general church. If the court determines that the general church is hierarchical, it leaves settlement of the dispute to the higher authorities within the church. See id., 727. If the court determines that the general church is not hierarchical, it applies the legal principles that govern voluntary associations. Id., 725. In contrast, a court following neutral principles of law under *Jones* need not conduct an in-depth examination of the polity of the general and local churches for evidence of a hierarchical structure but, rather, must

search the deed and the applicable statutory provisions and church documents for language indicating that the local church holds its property in trust for the general church. See *Jones* v. *Wolf*, supra, 443 U.S. 604. Although many of the same church documents may be examined under *Watson* and *Jones*, the underlying logic and analysis under each methodology is quite different.

If the court wishes to follow *Watson*, it is not necessary to examine church documents for language of trust after determining that the polity of the church is hierarchical because the hierarchical relationship, standing alone, is dispositive. Correspondingly, if the court wishes to follow *Jones*, there is no need to determine whether the polity of the church is hierarchical because the only relevant evidence is that relating to the respective authority of the general and local churches on the matter of church property, which may be found in the applicable statutory provisions, deeds and other secular documents, as well as in the church constitution, canons and rules. We thus conclude that we should clarify and simplify Connecticut law by choosing one of the two approaches instead of compelling the parties and the courts to provide evidence and make decisions under both.

In comparing the two methodologies, commentators have noted that the hierarchical approach favors general churches because, once civil courts have determined that the general church is hierarchical, they remove themselves from the controversy and allow the higher adjudicatory authorities within the denomination, which invariably support the position of the general church, to decide the dispute. See, e.g., A. Alderman, note, "Where's the Wall?: Church Property Disputes Within the Civil Courts and the Need for Consistent Application of the Law," 39 Ga. L. Rev. 1027, 1042 (2005); J. Hassler, comment, "A Multitude of Sins? Constitutional Standards for Legal Resolution of

Church Property Disputes in a Time of Escalating Intra-denominational Strife," 35 Pepp. L. Rev. 399, 428 (2008); B. Schmalzbach, note, "Confusion and Coercion in Church Property Litigation," 96 Va. L. Rev. 443, 447 (2010). As a consequence, this approach has been criticized as unfair because it results in the disparate treatment of local churches, depending on whether the general church is hierarchical, and inherently favors the general church by ignoring other possibly relevant facts. J. Hassler, supra, 428–29.

On the other hand, although the neutral principles of law approach has been adopted by the largest number of jurisdictions; see id., 457–63; it has produced vastly different outcomes because courts are allowed to rely on secular, as well as religious documents, including idiosyncratic state statutes and common-law principles. See A. Alderman, supra, 39 Ga. L. Rev. 1042–50; J. Hassler, supra, 35 Pepp. L. Rev. 431–35; B. Schmalzbach, supra, 96 Va. L. Rev. 450–57; see also *All Saints Parish Waccamaw* v. *Protestant Episcopal Church in the Diocese of South Carolina*, 385 S.C. 428, 446–49, 685 S.E.2d 163 (2009) (rejecting arguments that church constitution and canons created implied trust interest and resolving dispute on basis of language in deed and state law on trusts), cert. dismissed sub nom. *Green* v. *Campbell*, 559 U.S. 1059, 130 S. Ct. 2088, 176 L. Ed. 2d 580 (2010).

Having considered these differences, we conclude that the neutral principles of law approach is preferable because it provides the parties with a more level playing field, and the outcome in any given case is not preordained in favor of the general church, as happens in practice under the hierarchical approach. Moreover, as the court explained in *Jones*, the neutral principles approach is completely secular and "relies exclusively on objective, well established concepts of trust and property law familiar to lawyers and judges." *Jones* v. *Wolf*, supra, 443 U.S. 603. Insofar as the approach has

resulted in different outcomes in different states because of unique state statutes and common-law principles, *Jones* did not seem to regard the lack of uniform outcomes as a disadvantage. Rather, *Jones* noted that "the [f]irst [a]mendment does not dictate that a [s]tate must follow a particular method of resolving church property disputes. Indeed, a [s]tate may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." (Emphasis in original; internal quotation marks omitted.) Id., 602. *Jones* thus implicitly approved of possibly different outcomes in different jurisdictions and of allowing courts to develop still other approaches that might comport with local circumstances. Accordingly, we conclude that Connecticut courts should apply neutral principles of law in resolving future church property disputes.

## C

### Analysis

#### 1

We first consider whether the present case must be remanded to the trial court for review under the newly clarified standard. Connecticut is not the first jurisdiction to consider this issue. In *Foss* v. *Dykstra*, 319 N.W.2d 499, 500 (S.D. 1982), the South Dakota Supreme Court concluded that a remand was required after deciding to abandon the hierarchical approach in favor of neutral principles of law so that the parties could brief the question under the new standard. In contrast, the Supreme Court of Colorado concluded that a remand was unnecessary after adopting the neutral principles approach because the parties had argued both legal theories in the trial court. *Bishop & Diocese of Colorado* v. *Mote,* 716 P.2d 85, 103 (Colo.), cert. denied, 479 U.S. 826, 107 S. Ct. 102, 93 L. Ed. 2d 52

(1986). In the present case, we conclude that, because the parties followed the hybrid approach articulated in *New York Annual Conference* and *Trinity-St. Michael's Parish*, which required the presentation of evidence and arguments regarding the polity of the general church *and* any implied trust interest that the church might have held in the disputed property, and because this court requested the parties to file supplemental briefs addressing whether the constitution and canons of the Episcopal Church contain language of trust under a neutral principles analysis, they have had an adequate opportunity to brief the issues under the standard articulated in *Jones*.[12] Accordingly, a remand is not required

[12] In their complaint, the plaintiffs alleged not only that the polity of the church is hierarchical but that the real and personal property of the Parish is held in trust for the Episcopal Church and the Diocese. The plaintiffs similarly argued in their memorandum of law in support of their motion for summary judgment that the property of the Parish is held in trust for the Episcopal Church and the Diocese on the basis of provisions in the constitution and canons of the Episcopal Church specifically relating to property, Connecticut statutes governing religious corporations, the history of the Parish, including its acquisition and disposition of various church properties since 1956, and compliance by the Parish with church and canon law on property. In their opposition to the plaintiffs' motion for summary judgment, the defendants responded that the church polity was not hierarchical and that the plaintiffs' claim of an implied trust interest in the Parish property by the Episcopal Church and the Diocese was not supported by the facts or the law. The defendants also contended that neutral principles of property law should be applied to resolve the dispute by reviewing property deeds, bank accounts and the Marketable Title Act, among other things.

Similarly, in its memorandum of decision, the trial court stated that it was required, under *Trinity-St. Michael's Parish*, to "examine the polity of the church, in addition to the church constitution and its canons, for language of trust in favor of the general church." (Internal quotation marks omitted.) The court then reviewed several Connecticut statutes addressing the legal status, powers and regulations of the Episcopal Church, as well as church operating documents, including the canons and constitutions of the Episcopal Church and the Diocese, for evidence of an implied trust interest in the disputed property. The court concluded its analysis with a review of the defendants' special defenses, which the defendants describe in their appeal as "premised upon bedrock neutral principles of property law," before granting the plaintiffs' motion for summary judgment and denying the defendants' motion for summary judgment. Consequently, in following the hybrid approach set forth in *New York Annual Conference* and *Trinity-St. Michael's Parish*, the parties argued, and the trial court applied, the legal theories set

for further presentation of evidence and argument under this approach.

2

The defendants challenge the trial court's conclusion that the plaintiffs had "proven, beyond genuine factual dispute," the existence of a trust interest in the Parish property on three distinct grounds. They first claim that the trial court ignored a "classic issue of fact," namely, the intent of the parties. Relying on affidavits from two expert witnesses and fourteen members of the Parish from the 1950s to the present, in which each member explains his or her "understanding," "expect[ation]" or "belie[f]" that Parish property has always been controlled by the Parish, the defendants contend that the understandings of Parish members and the two experts conflict with the plaintiffs' claim that the Episcopal Church and the Diocese hold an implied trust interest in the Parish property, and, therefore, a factual dispute exists that precludes the granting of summary judgment for the plaintiffs. The defendants further claim that the parties disagree as to the meaning of certain provisions in the church constitution and canons regarding control over parish property,[13] and that the constitutions and canons in 1956 did not contain language suggesting that an implied trust interest existed in favor of the Episcopal Church. The defendants finally claim that, although the Dennis Canon expressly provides that all real and personal parish property is held in trust for the general church, the Dennis Canon does not apply because it was enacted by the General Convention of

forth in both *Watson* and *Jones*, and it is not necessary to remand the case so that the parties may provide additional evidence in light of the newly clarified standard.

[13] The defendants make this claim in the context of their argument that the church polity in the present case is not hierarchical, but, in the interest of fairness, we address the argument under neutral principles of law because it is clearly an argument that the Diocese and the Episcopal Church have no implied trust interest in the Parish property.

the Episcopal Church in 1979, after the relevant real estate transactions in this case.

The plaintiffs respond that the experts' affidavits on which the defendants rely fail to create a triable issue of fact because they contain only inadmissible legal opinions, which do not constitute competent evidence. They also argue that the trial court properly concluded that the Parish property is held in trust for the Episcopal Church and the Diocese under a theory of implied trust or pursuant to the Dennis Canon. We conclude that there is no genuine issue of material fact as to whether the Parish controls the disputed property in this case because the Dennis Canon expressly provides that all parish property is held in trust for the Episcopal Church and the diocese in which the parish is located.

It is undisputed that the deeds to the property in question are in the name of "Bishop Seabury Parish" or "Bishop Seabury Church." There is no language of express trust in those deeds or in the deeds of the property previously owned by the Parish and subsequently conveyed to others. We thus look to the canons of the Episcopal Church and the Diocese under neutral principles of law to determine whether they contain language of trust in favor of the general church.[14]

---

[14] Both *Watson* and *Jones* recognized that the fact that parish property is held in the name of the church is not dispositive of the ownership issue unless the deed expressly provides that the property is to be dedicated by way of a trust to the teachings of a specific religious doctrine. See *Jones* v. *Wolf*, supra, 443 U.S. 606; *Watson* v. *Jones*, supra, 80 U.S. (13 Wall.) 723–24. This court similarly recognized in *Trinity-St. Michael's Parish* that "[w]hether a parish holds record title . . . is not dispositive of whether a trust agreement exists." *Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Connecticut*, supra, 224 Conn. 819–20 n.21. Accordingly, the defendants' argument that the Diocese waived all claims to any right, title or interest in the property because it deeded the original property to "Bishop Seabury Church" in 1956, or because the Episcopal Church never conditioned its approval of that or any other property transaction on the inclusion of an express provision concerning its interest, has no merit.

The Dennis Canon was approved by the General Convention of the Episcopal Church in 1979, shortly after *Jones* was decided.[15] See, e.g., *Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Connecticut*, supra, 224 Conn. 805. In *Jones*, the court responded to the argument that "a rule of compulsory deference is necessary in order to protect the free exercise rights of those who have formed the [religious] association and submitted themselves to its authority" by explaining that, "[u]nder the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.*" (Emphasis added; internal quotation marks omitted.) *Jones* v. *Wolf*, supra, 443 U.S. 605–606.

In apparent response to this advice, the General Convention of the Episcopal Church enacted canons I.7.4,[16]

---

[15] According to the affidavit of the plaintiffs' expert, Robert Bruce Mullin, the Dennis Canon was adopted by the General Convention in 1979 because a majority of convention delegates agreed with the suggestion that it would be prudent to follow the direction that the United States Supreme Court had given a few months earlier in *Jones* by affirming and making clear that the Episcopal Church and the Diocese hold a trust interest in parish property that may be enforced by civil courts.

[16] See title I of the constitution and canons of the Episcopal Church, canon 7, § 4.

I.7.5[17] and II.6[18] in 1979 to clarify that a parish holds real and personal property in trust for the Episcopal Church and the dioceses. Canon I.7.4, which has come to be known as the Dennis Canon, specifically provides: "All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for th[e] [Episcopal] Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, th[e] [Episcopal] Church and its Constitution and Canons." Canon I.7.5 further provides: "The several Dioceses may, at their election, further confirm the trust declared under the foregoing Section 4 by appropriate action, but no such action shall be necessary for the existence and validity of the trust." Canon II.6.4 reinforces the foregoing sections by providing: "Any dedicated and consecrated Church or Chapel shall be subject to the trust declared with respect to real and personal property held by any Parish, Mission, or Congregation as set forth in Canon I.7.4."

When the Dennis Canon is considered together with the application submitted by the members of the local congregation in 1956 for admission to the general church as a parish and with other church documents, it is clear that the disputed property in the present case is held in trust for the Episcopal Church and the Diocese. For example, on May 9, 1956, forty members of the congregation signed a form required by § 2 of canon 1 of the constitution and canons of the Diocese

[17] See title I of the constitution and canons of the Episcopal Church, canon 7, § 5.
[18] See title II of the constitution and canons of the Episcopal Church, canon 6.

to organize as a parish, in which they expressed the following commitment: "We, the subscribers, residents of the town of Groton and vicinity, in the [c]ounty of New London, in the [s]tate of Connecticut, do hereby unite to form [a]nd do hereby form ourselves and our successors into an [e]cclesiastical [s]ociety under the [c]onstitution and [l]aws of said [s]tate and *under the [c]onstitution and [c]anons of the Protestant Episcopal Church in the Diocese of Connecticut*, for the purpose of supporting the [w]orship of Almighty God according to the [d]octrine, [d]iscipline and [l]iturgy of said [c]hurch in these United States, said [s]ociety to be known in law as Bishop Seabury Parish, in the [t]own of Groton, in the [c]ounty of New London and [s]tate of Connecticut." (Emphasis added.) Article I of the constitution of the Diocese, which has remained unchanged since 1956, and to which the congregation members committed themselves in applying to become a parish, provides that "[t]he Diocese of Connecticut, as a constituent part of the body known as the Protestant Episcopal Church in the United States of America, *accedes to, recognizes and adopts* the General Constitution of that Church, and acknowledges its authority accordingly." (Emphasis added.) Correspondingly, article V of the constitution of the Episcopal Church, § 1, provides in relevant part that the duly adopted constitution of any new diocese shall include "an *unqualified accession to the Constitution and Canons of [the Episcopal] Church* . . . ." (Emphasis added.)

Thus, in agreeing in 1956 to abide by the constitution and canons of the Diocese, members of the congregation also agreed to abide by the constitution and canons of the Episcopal Church, including the subsequently enacted Dennis Canon. There is no provision in the constitution and canons of the Episcopal Church or the Diocese expressing an intent to the contrary or excusing a parish, either explicitly or implicitly, from complying

with amendments or additions to the constitution and canons that might be enacted after a parish is accepted by the Diocese. In fact, in his letter to the committee on admission of new parishes dated May 14, 1956, Bishop Gray specifically referred to and enclosed the May 9, 1956 statement of formal organization of the Parish into an ecclesiastical society "under the [c]onstitution and [l]aws of the [s]tate of Connecticut and *under the [c]onstitution and [c]anons of the Protestant Episcopal Church of the Diocese of Connecticut*." (Emphasis added.)

Furthermore, Parish members have always acted as though the Episcopal Church held a trust interest in the property. Section 4 of canon 57, which was enacted by the General Convention of the Episcopal Church in 1940 and required that a parish obtain approval before entering into any real estate transaction, provided: "No Vestry, Trustee, or other Body, authorized by civil or canon law to hold, manage, or administer real property for any parish, mission, congregation or institution shall encumber or alienate the same or any part thereof (save for the refinancing of an existing loan) *without the written consent of the Bishop and Standing Committee of the Diocese*, or the Bishop and Council of Advice of the Missionary District, of which the parish, mission, congregation or institution is a part, except under such regulations as may be prescribed by canons of the Diocese or Missionary District." (Emphasis added.) Although the provision was slightly reworded in 1943, it has remained in effect to this day and can now be found in substantially the same form in canon I.7.3.[19]

---

[19] Canon 7 of title I of the constitution and canons of the Episcopal Church, § 3, provides: "No Vestry, Trustee, or other Body, authorized by Civil or Canon law to hold, manage, or administer real property for any Parish, Mission, Congregation, or Institution, shall encumber or alienate the same or any part thereof without the written consent of the Bishop and Standing Committee of the Diocese of which the Parish, Mission, Congregation, or Institution is a part, except under such regulations as may be prescribed by Canon of the Diocese."

Thus, after the original property was quitclaimed in 1956 to the Parish by the Missionary Society of the Diocese, the Parish sought approval from the Diocese *each and every time* it wished to purchase, finance or sell real property in succeeding years. See part I A of this opinion. If Parish members believed that they had sole ownership and control over Parish property and could have entered into real property transactions *without* the approval of the Diocese because it had no interest in Parish property, there would have been no reason to seek the Bishop's permission and to conduct such transactions only *after* he granted approval. Accordingly, Parish members acted consistently as though the Diocese and the Episcopal Church held a trust interest in the property both before and after the Dennis Canon was enacted by the General Convention.

The highest courts of several other jurisdictions also have concluded that the Dennis Canon applies to defeat claims of ownership and control over parish property by disaffected parish members, even in cases in which record title to the property has been held in the name of the parish since before enactment of the provision. See, e.g., *Episcopal Church Cases,* 45 Cal. 4th 467, 485–89, 198 P.3d 66, 87 Cal. Rptr. 3d 275 (denying defendants' motion to strike and finding for plaintiffs on grounds that [1] under Dennis Canon and California statutory authority, parish held property in trust for general church and could use property only as long as parish remained part of general church, and [2] parish promised to be bound by constitution and canons of general church in original application in 1947 to become parish and in articles of incorporation in 1949), cert. denied sub nom. *Rector, Wardens & Vestrymen of Saint James Parish in Newport Beach, California* v. *Protestant Episcopal Church in the Diocese of Los Angeles,* 558 U.S. 827, 130 S. Ct. 179, 175 L. Ed. 2d 41 (2009); *Episcopal Diocese of Rochester* v. *Harnish,* 11 N.Y.3d 340,

351–52, 899 N.E.2d 920, 870 N.Y.S.2d 814 (2008) (rendering judgment in favor of plaintiff on grounds that [1] Dennis Canon clearly established express trust in favor of general church, and [2] parish agreed to abide by constitution and canons of general church either upon incorporation in 1927 or upon recognition as parish in 1947); *In re Church of St. James the Less*, 585 Pa. 428, 447–50, 888 A.2d 795 (2005) (concluding that parish held property in trust for benefit of general church on grounds that [1] parish was bound by express trust language in Dennis Canon, and [2] parish clearly intended to place property in trust for general church prior to enactment of Dennis Canon when it agreed to "always accede to the authority of the . . . Episcopal Church and the [d]iocese").

The defendants nonetheless argue that this court determined in *Trinity-St. Michael's Parish* that the Dennis Canon is an express trust provision and that, insofar as a theory of express trust was not pleaded or pursued in the present case, it would be a "[m]anifest [i]njustice" to inject the issue into the discussion at this late date. The defendants maintain that the case has been litigated entirely on the basis of an alleged implied trust interest and that the trial court specifically ruled that, "[b]ecause the plaintiffs have not alleged or demonstrated that the Parish subscribed to an express trust provision at the time of any relevant real estate transaction, the dispositive issue is whether they have proven, beyond genuine factual dispute, an implied trust [interest in the property] . . . ." We disagree that the pleadings focused solely on the claim of an implied trust interest and included no discussion of the Dennis Canon.

The plaintiffs alleged in paragraph thirty-two of their complaint that the Dennis Canon "provides in part that . . . '[a]ll real and personal property held by or for the benefit of any Parish, Mission or Congregation is held

in trust for [the Episcopal] Church and the Diocese thereof in which such Parish, Mission or Congregation is located.' " The plaintiffs alleged in paragraphs twenty-one,[20] twenty-four[21] and twenty-six[22] that local churches are bound by the constitution and canons of the Episcopal Church. The plaintiffs likewise noted in their memorandum in support of their motion for summary judgment that the Episcopal Church had confirmed its long-standing interest in parish property in 1979 when, in response to *Jones*, it adopted the Dennis Canon. The plaintiffs did not otherwise discuss the Dennis Canon in their memorandum. In an accompanying affidavit, however, Mullin, the plaintiffs' expert witness, provided an extensive history of the Episcopal Church and opined that enactment of the Dennis Canon had confirmed the principle implicit in preexisting canons that a parish holds its real and personal property in trust for the Episcopal Church and the diocese in which the parish is located.

In their memorandum in opposition to the plaintiffs' summary judgment motion, the defendants also discussed the Dennis Canon, arguing that any alleged trust interest described therein had been waived by another canon of the Diocese concerning church property, and that the Dennis Canon could be read to allow parishes to disassociate from the Episcopal Church and to take

[20] Paragraph twenty-one of the complaint provides in relevant part: "The General Convention [of the Episcopal Church] has enacted a constitution and a set of church laws, known as canons, by which all affiliated dioceses and local churches are bound."

[21] Paragraph twenty-four of the complaint provides in relevant part: "The Diocese . . . is subject to and accedes to the [c]onstitution . . . and canons of [t]he Episcopal Church and to the authority of the General Convention. Pursuant to the same and its own [c]onstitution and canons, the Diocese . . . exercises authority over parishes . . . of the Diocese . . . ."

[22] Paragraph twenty-six of the complaint provides in relevant part: "[A]ll [vestry members] . . . must faithfully perform their duties in accordance with the [c]onstitution and canons of [t]he Episcopal Church and the diocese in which they serve . . . ." (Citation omitted.)

church property with them. In fact, one of the defendants' expert witnesses, Right Reverend William C. Wantland, challenged the applicability of the Dennis Canon on the ground that church property cannot be held in trust for the Episcopal Church without the written consent of the parish.

On appeal, both parties made only fleeting references to the Dennis Canon in their initial briefs, focusing instead on other provisions in the Episcopal Church constitution and canons that existed in 1956.[23] In response to this court's request, however, the parties subsequently filed supplemental briefs discussing the applicability of the Dennis Canon to the issues in this case. Moreover, the fact that the trial court opted to decide the case on a theory of implied trust does not preclude this court from considering and relying on a different ground previously raised and briefed by the parties to uphold the trial court's decision. The trial court explained that its reason for deciding the case under a theory of implied trust was that "the plaintiffs have not alleged or demonstrated that the Parish subscribed to an express trust provision *at the time of any relevant real estate transaction* . . . ." (Emphasis added.) The court thus did not consider whether the agreement of Parish members to abide by the Episcopal Church constitution and canons in 1956 bound them to amendments and additions that might take effect *after* 1956. Accordingly, both parties discussed the Dennis Canon to varying degrees in their pleadings, and we

---

[23] The plaintiffs merely described the Dennis Canon in their statement of facts, as they did in their memorandum in support of their summary judgment motion, as confirming the Episcopal Church's implied trust interest in local church property. The defendants relegated discussion of the Dennis Canon to a footnote in which they quoted *Trinity-St. Michael's Parish* for the proposition that, "[b]ecause the Dennis Canon was not enacted until 1979, it is undisputed that no express trust existed at the time of the relevant property transactions involved in [the present] case." (Internal quotation marks omitted.)

reject the defendants' claim that the pleadings did not refer to the Dennis Canon or that the trial court's decision to resolve the issue on a different ground precludes this court from considering and applying the Dennis Canon to resolve the issue on appeal.

The defendants respond that, even if the parties had addressed the Dennis Canon in their original pleadings, a question of fact would remain because donors who gave substantial sums of money to the Parish understood, or were told by Reverend Gauss, that the Parish had sole control over its property. This is similar to the defendants' challenge to the trial court's decision under the theory of implied trust. With respect to the subjective understandings and beliefs of Parish members, however, *Jones* indicates that the evidence required to demonstrate that an implied trust exists under neutral principles of law must be *documentary* evidence, such as the relevant deeds and state statutes, and the constitution and canons of the general and local churches.[24] See *Jones* v. *Wolf,* supra, 443 U.S. 604. Indeed, we are unaware of any case in this or other jurisdictions in which a court has concluded that a parishioner's subjective intent based on what he or she personally believed or was told regarding ownership of parish property is relevant to the disposition of a church property dispute. See, e.g., *Episcopal Church Cases,* supra, 45 Cal. 4th 493 (considering similar argument regarding intent of parties and concluding that "[t]he only intent a secular court can effectively discern is that expressed in legally cognizable documents"). Finally, the donors who gave a large sum of money to the Parish from their lottery

---

[24] The testimonial evidence that was deemed significant in *Trinity-St. Michael's Parish* concerned interpretation of the constitutions and canons of the Episcopal Church and the Diocese; see *Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Connecticut,* supra, 224 Conn. 808–13; and not the affiants' personal statements that they always had understood the parish to have control over its property.

winnings contributed the funds over a period of several years in the 1990s, *after* the Dennis Canon was enacted.[25] Accordingly, the subjective intent and personal beliefs of the parties, including those of the donors, are, according to *Jones*, irrelevant in an express trust case and cannot create a genuine issue of fact.

The defendants also claim that the Dennis Canon is inapplicable because this court emphasized in *New York Annual Conference* and *Trinity-St. Michael's Parish* that changes made to church documents by a denomination after property has been acquired do not apply to resolve ownership disputes. We disagree.

The defendants refer to this court's statements in *New York Annual Conference* that "it seems unlikely

[25] To the extent the defendants claim that Parish members, including the lottery winners, did not know that the Dennis Canon existed, § 5 of part III of the Parish bylaws, which was adopted in January, 1978, one year before the Dennis Canon was enacted, provides that "[i]t shall be the duties of the officers, Wardens and Vestrymen to familiarize themselves with the Constitution and Canons of the Diocese of Connecticut. It shall be the duty of the Clerk to study the Journal of Convention of the Diocese of Connecticut in each year, to report to the Vestry any amendments to the Constitution or Canons of the Diocese and to cause the above quoted portions of the Canons to be kept up to date." In a similar vein, canon I.1.1 (e) of the Episcopal Church provides that notices of amendments to the constitution shall be delivered to every diocese by certified or registered mail: "It shall be the duty of the Secretary of the House of Deputies, whenever any alteration of the Book of Common Prayer or of the Constitution is proposed, or any other subject submitted to the consideration of the several Diocesan Conventions, to give notice thereof to the Ecclesiastical Authority of the Church in every Diocese, as well as to the Secretary of the Convention of every Diocese, and written evidence that the foregoing requirement has been complied with shall be presented by the Secretary to the General Convention at its next session. All such notices shall be sent by certified or registered mail . . . ." Although the Dennis Canon is not a constitutional provision, one might presume, under the foregoing rules, that significant amendments to the canons, as well as to the constitution, would be reported to the dioceses by the Episcopal Church and that parish officers, wardens and vestrymen would familiarize themselves with important changes to the constitution and canons of the Episcopal Church as well as to the constitution and canons of the Diocese.

that even a hierarchical general church could bind its local churches in perpetuity to observe any and all of its ecclesiastical commandments, including its constraints on disaffiliation"; *New York Annual Conference of the United Methodist Church* v. *Fisher*, supra, 182 Conn. 285; and "[i]t may well be that the applicable rules of the hierarchical church to which [the local church] was connected did not at all relevant times create a preference for the general church. If not, such property would remain with [the local church] despite its connection with the [general church]." Id., 298. These statements have nothing to do with the applicability of the Dennis Canon, however, because the first was made in discussing whether a local church could disaffiliate from a hierarchical church, an issue that the court did not reach and that is not relevant in the present context, and the second was purely speculative because the court had not yet ascertained and interpreted the rules of the general church that governed its rights in property deeded to a local church.

Insofar as the defendants also attack the applicability of the Dennis Canon on the basis of this court's statement in *Trinity-St. Michael's Parish* that, "[b]ecause the Dennis Canon was not enacted until 1979, it is undisputed that no express trust existed at the time of the relevant property transactions involved in [that] case"; *Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc.* v. *Episcopal Church in the Diocese of Connecticut*, supra, 224 Conn. 805; the court was merely acknowledging that no express trust existed at the time of the relevant property transactions in that case. Such an acknowledgment is far different from recognition that changes made to the constitution and canons of the Episcopal Church following the acquisition of church property should not be allowed to govern future disputes concerning property ownership and control, a question the court simply did not address in *Trinity-*

*St. Michael's Parish.* The court instead observed that "[t]he evidence at trial overwhelmingly established that the Dennis Canon adopted in 1979 merely codified in explicit terms a trust relationship that has been implicit in the relationship between local parishes and dioceses since the founding of [the Episcopal Church] in 1789"; id., 821–22; thus stopping short of, but not contradicting, the conclusion that we reach today. Consequently, we reject the defendants' claim that the reasoning in *Trinity-St. Michael's Parish* is inconsistent with the reasoning in this opinion.

The defendants further claim that the neutral principles of law approach is meaningless if this court accepts "a denomination's self-serving declaration of trust," and that the United States Supreme Court has stated that courts may enforce only those trusts that are in " 'legally cognizable form.' " They argue that reliance on a declaration such as the Dennis Canon would eradicate neutral principles of law, including the principles that (1) "the language of a deed expresses the intention of the parties," (2) "parol evidence cannot be used to vary the terms of a deed," (3) "the Marketable Title Act extinguishes interests which remain unrecorded for [forty] years," (4) "the statute of frauds requires written proof (from the grantor's hand) of a grant of an interest in land," and (5) "only the owner of property can place it in trust, not the purported beneficiary." We disagree for two reasons. First, the defendants omit the explanation that precedes the court's statement that a trust must be in a "legally cognizable form" in order to be enforceable. *Jones* v. *Wolf,* supra, 443 U.S. 606. That statement, in its entirety, reads as follows: "Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At *any time before the dispute erupts*, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the

deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.*" (Emphasis added.) Id. *Jones* thus not only gave general churches explicit permission to create an express trust in favor of the local church but stated that civil courts would be *bound* by such a provision, as long as the provision was enacted *before* the dispute occurred. We also reject the view that the Dennis Canon represents a "self-serving declaration of trust" because, as we previously noted, Parish members agreed to be bound by the constitutions and canons of the Episcopal Church and the Diocese in 1956 when they affiliated with the Episcopal Church, and, as a result, their interests are in harmony with those of the Episcopal Church and the Diocese.

To the extent the defendants rely on *All Saints Parish Waccamaw* v. *Protestant Episcopal Church in the Diocese of South Carolina,* supra, 385 S.C. 428, and *Arkansas Presbytery of the Cumberland Presbyterian Church* v. *Hudson,* 344 Ark. 332, 40 S.W.3d 301, cert. denied, 534 U.S. 945, 122 S. Ct. 329, 151 L. Ed. 2d 243 (2001), those cases are distinguishable. In *All Saints Parish Waccamaw,* the South Carolina Supreme Court, applying neutral principles of law, determined that the disputed property was owned by the local church. *All Saints Parish Waccamaw* v. *Protestant Episcopal Church in the Diocese of South Carolina,* supra, 445–49. The court, however, specifically relied on South Carolina statutory and common law, including the law on trusts, relating to the formal conveyance of title, and thus gave no weight to the Dennis Canon. Id., 446–49;

see also id., 449 ("[i]t is an axiomatic principle of law that a person or entity must hold title to property in order to declare that it is held in trust for the benefit of another or transfer legal title to one person for the benefit of another"). Moreover, the court did not examine documents signed by congregation members when they were seeking to become a parish, which might have indicated whether parish members had agreed to abide by the constitution and canons of the Episcopal Church.

In *Arkansas Presbytery of Cumberland Presbyterian Church* v. *Hudson,* supra, 342 Ark. 343–44, the Supreme Court of Arkansas ignored a provision similar to the Dennis Canon in the constitution of the general church that was adopted after the conveyance of the disputed property and relied instead on a constitutional provision that had been in effect at the time of the conveyance stating that church property was to be deeded to the trustees of the local church for its benefit and use. The court focused on the language of the deeds to the properties and, as in *All Saints Parish Waccamaw,* did not examine commitments made by local church members when they affiliated with the general church. See id., 340–41. Furthermore, we are not aware of any case that has followed the reasoning of the Supreme Court of Arkansas in declining to rely on an express trust provision in a general church's constitution or canons merely because the provision was enacted after the disputed property was conveyed to the local church.

The defendants further contend that the Dennis Canon was not enacted by the members of the Parish but, rather, by the Episcopal Church and the Diocese. They note that the General Convention of the Episcopal Church, which adopts the canons, consists only of representatives of the various dioceses and does not include representatives of the parishes. Accordingly, the defendants claim that actions taken at the General

Convention do not reflect the intention of the Parish. We do not agree. Although the parishes are not directly represented in the General Convention, each parish in the Diocese elects one lay delegate to the Annual Convention of the Diocese, which, in turn, elects up to four lay delegates to the General Convention.[26] It is thus possible that a parish member could be elected to represent the Diocese at the General Convention. More significantly, amendments to the constitution and canons of the Episcopal Church are binding on the Parish because its members agreed to be so bound in their application to become a parish. Consequently, the fact that the Parish may not be directly represented at the General Convention has no bearing on whether the Dennis Canon applies to resolve this dispute.

The defendants also claim that cases in other jurisdictions that have been resolved by application of the Dennis Canon involved facts that were not present in this case. We disagree. For example, the defendants claim that, in *Bishop & Diocese of Colorado* v. *Mote*, supra, 716 P.2d 85, the Colorado Supreme Court resolved a similar church property dispute by relying on the bylaws of the local church, which provided that it would "accede to the [c]onstitution and [c]anons of the [Episcopal Church], and the [e]cclesiastical

---

[26] Article X of the constitution of the Diocese provides in relevant part: "Deputies from this Diocese to the General Convention shall be elected by ballot at the Annual Convention next preceding any stated General Convention, or at such other time as the Diocesan Convention may determine; and the Deputies thus elected shall continue in office for three years. . . ."

Article I, § 4, of the constitution of the Episcopal Church provides in relevant part: "The Church in each Diocese which has been admitted to union with the General Convention . . . shall be entitled to representation in the House of Deputies by not more than four ordained persons, Presbyters or Deacons, canonically resident in the Diocese and not more than four Lay Persons, confirmed adult communicants of [the] [c]hurch, in good standing in the Diocese but not necessarily domiciled in the Diocese; but the General Convention by Canon may reduce the representation to not fewer than two Deputies in each order. . . ."

[a]uthority and [c]anons of the Diocese of Colorado";
(internal quotation marks omitted) id., 105; and on the
local church's articles of incorporation, which provided
that the local church would "administer the temporali-
ties of the Protestant Episcopal Church in the [p]arish
. . . ." (Internal quotation marks omitted.) Id., 104. The
articles of incorporation, however, required the congre-
gation members in that case to make the same commit-
ment made by congregation members in the present
case, namely, to abide by the constitution and canons
of the Episcopal Church and the [d]iocese when the
local church became a parish, and the Colorado court
determined that the reference in the articles of incorpo-
ration to the administration of the "temporalities" of
the Episcopal Church in the parish was subject to
this commitment.

In *Protestant Episcopal Church in the Diocese of
New Jersey* v. *Graves*, 83 N.J. 572, 580, 417 A.2d 19
(1980), cert. denied sub nom. *Moore* v. *Protestant Epis-
copal Church in the Diocese of New Jersey*, 449 U.S.
1131, 101 S. Ct. 954, 67 L. Ed. 2d 119 (1981), another
case cited by the defendants for the proposition that
other courts have applied the Dennis Canon in a differ-
ent factual context, the Supreme Court of New Jersey
applied the hierarchical approach to resolve the church
property dispute. Accordingly, that case also provides
no direct comparison with the present case.

The defendants next cite *Episcopal Diocese of Roch-
ester* v. *Harnish*, supra, 11 N.Y.3d 340, claiming that the
New York Court of Appeals resolved a similar dispute in
part on the ground that the local church was incorpo-
rated under article 3 of the New York Religious Corpora-
tions Law,[27] which, according to the defendants,

---

[27] See N.Y. Relig. Corp. Law §§ 40 through 49 (McKinney 1990 and Sup.
2011). The New York Religious Corporations Law governs Protestant Episco-
pal parishes or churches in New York. *Episcopal Diocese of Rochester* v.
*Harnish*, supra, 11 N.Y.3d 346–47.

deemed the local church subject to the Episcopal Diocese of Rochester and the Episcopal Church. The defendants, however, misconstrue that case because the New York court, after finding that the Religious Corporations Law did not conclusively establish a trust in favor of the diocese or the Episcopal Church, decided the case solely on the basis of the Dennis Canon. Id., 351–52.

The defendants finally cite *Episcopal Church Cases*, supra, 45 Cal. 4th 467, in which the Supreme Court of California resolved a church property dispute on the ground that the local church agreed to be "forever held under, and conform to and be bound by, the [e]cclesiastical authority of the Bishop of Los Angeles . . . the [c]onstitution and [c]anons of the [Episcopal Church], and the [c]onstitution and [c]anons of the Diocese of Los Angeles." (Internal quotation marks omitted.) Id., 474. The facts in the present case, however, are similar to, not distinguishable from, those of the California case because the Parish members in this case also had agreed to abide by the constitutions and canons of the Episcopal Church and the Diocese, which included the subsequently enacted Dennis Canon. Accordingly, the cases on which the defendants rely do not support their claim that there are substantial differences between the present case and those in other jurisdictions that have applied the Dennis Canon to resolve church property disputes.[28]

---

[28] Additional cases cited by the defendants in which the courts concluded that local churches owned and controlled church property are not relevant because they relied on state statutory and common law; see *All Saints Parish Waccamaw* v. *Protestant Episcopal Church in the Diocese of South Carolina*, supra, 385 S.C. 446–48; or involved disputes that arose prior to enactment of the Dennis Canon. See *Protestant Episcopal Church in the Diocese of Los Angeles* v. *Barker*, 115 Cal. App. 3d 599, 608–10, 171 Cal. Rptr. 541, cert. denied, 454 U.S. 864, 102 S. Ct. 323, 70 L. Ed. 2d 163 (1981); *Calkins* v. *Cheney*, 92 Ill. 463, 472–74 (1879); *Bjorkman* v. *Protestant Episcopal Church in the United States of America*, 759 S.W.2d 583, 584 (Ky. 1988); *Sohier* v. *Trinity Church*, 109 Mass. 1, 16–17 (1871); *Rector & Wardens of King's Chapel* v. *Pelham*, 9 Mass. (9 Tyng) 501, 507–508 (1813).

The defendants also challenge the trial court's decision with respect to five of their fifteen special defenses that the trial court rejected,[29] arguing that the court improperly disregarded established principles of property and trust law to find that the Episcopal Church and the Diocese held an implied trust interest in the property. Because we uphold the trial court's decision on the ground that there is an express trust interest in favor of the Episcopal Church and the Diocese, however, the special defenses are no longer relevant, and we need not address them. Accordingly, we conclude that there is no genuine issue of material fact that would require reversal of the trial court's decision on the parties' summary judgment motions.

## II

## MOTION FOR ORDER OF ACCOUNTING

The defendants claim that the trial court improperly granted the plaintiffs' motion for an order of accounting because the plaintiffs did not plead or prove that they had demanded an accounting prior to initiating the present action, as required under Connecticut law. See *Zuch* v. *Connecticut Bank & Trust Co.*, 5 Conn. App. 457,

---

[29] The defendants claim that the trial court improperly rejected their (1) second special defense that the Marketable Title Act, General Statutes § 47-33b et seq., extinguished any claims to the property asserted by the Episcopal Church or the Diocese, (2) fourth special defense that the plaintiffs have no trust interest in the real property of the Parish because the statute of frauds requires a signed, written agreement for a trust to be effective, (3) seventh special defense that the Diocese expressly waived its right to any interest in the real property of the Parish when the missionary society of the Diocese conveyed its right, title and interest in the property to "Bishop Seabury Church" by way of quitclaim deed, (4) eighth special defense that the plaintiffs could not assert an implied trust against the Parish property because Connecticut law does not recognize the imposition of such a trust against nonprofit, charitable, religious associations, and (5) fifth special defense that, to the extent the plaintiffs rely on General Statutes § 33-265, which addresses the legal status and powers of ecclesiastical societies "in communion with" the Episcopal Church, this statute is unconstitutional under the federal and state constitutions.

461–63, 500 A.2d 565 (1985).[30] The defendants contend that the plaintiffs did not use the term "accounting" in its general sense but requested an accounting, as that term is used in General Statutes § 52-401 et seq.,[31] so that they could claim at some future date that the trial court previously had found that they were entitled to damages from the defendants for any diminution in the value of the Parish property before being compelled to relinquish it to the plaintiffs. The defendants further contend that the plaintiffs were not entitled to an accounting because they failed to plead the statute relied on, as required under Practice Book § 10-3,[32] and

[30] "The general rule is that a prior demand by the plaintiff for an accounting and a refusal by the defendant to account is a prerequisite to the commencement of an action for an accounting." *Zuch* v. *Connecticut Bank & Trust Co.*, supra, 5 Conn. App. 461.

[31] The two most relevant provisions are General Statutes §§ 52-401 and 52-402.

General Statutes § 52-401 provides: "In any judgment or decree for an accounting, the court shall determine the terms and principles upon which such accounting shall be had."

General Statutes § 52-402 provides: "(a) When a judgment is rendered against the defendant in an action for an accounting that he account, the court shall appoint not more than three disinterested persons to take the account, who shall be sworn and shall appoint the time and place for the hearing and give reasonable notice thereof to the parties.

"(b) If the defendant refuses to attend at the time and place appointed and to produce his books and render his account, the auditors shall receive from the plaintiff his statement of the account and award to him the whole sum he claims to be due.

"(c) If the parties appear and produce their books, the auditors shall hear the parties and their witnesses and shall examine the books. If either party refuses to be sworn or to answer any proper questions respecting his account, the auditors may commit him to a community correctional center, there to continue until he consents to be sworn and answer all proper interrogatories.

"(d) After hearing, the auditors shall adjust the accounts, find the balance due and immediately report to the court. The fees and expenses of the auditors, as fixed and allowed by the court, shall be paid by the party in whose favor the report is made and the court shall render judgment that the party in whose favor it was made shall recover the sum found to be due, with costs, including the fees and expenses of the auditors."

[32] Practice Book § 10-3 provides in relevant part: "(a) When any claim made in a complaint, cross complaint, special defense, or other pleading is

because any claim for damages against the defendants would be barred by General Statutes § 52-557m[33] and 42 U.S.C. § 14503.[34]

The plaintiffs respond that the trial court did not grant their motion in reliance on the accounting statutes but, rather, under its equitable authority, and that the order merely was intended to provide for an inspection and inventory of the Parish assets. We agree with the plaintiffs.

The plaintiffs alleged in paragraph sixty-eight of their complaint, dated April 30, 2008, that Bishop Andrew Smith had demanded, on behalf of the Diocese, that the defendants relinquish their right to possess and use all real and personal property of the Parish on or before January 20, 2008, but that the defendants had refused to comply with those demands. The plaintiffs also alleged in paragraph seventy-two that, on April 15, 2008, Reverend Cannon had gone to the property to assume his duties as priest in charge and had asked Reverend Gauss to turn over the keys and all pertinent parish records but that Reverend Gauss had refused to comply.

grounded on a statute, the statute shall be specifically identified by its number. . . ."

[33] General Statutes § 52-557m provides that the directors, officers and trustees of nonprofit, tax-exempt organizations have immunity from liability. The statute specifically provides: "Any person who serves as a director, officer or trustee of a nonprofit organization qualified as a tax-exempt organization under Section 501(c) of the Internal Revenue Code of 1986, or any subsequent corresponding internal revenue code of the United States, as from time to time amended, and who is not compensated for such services on a salary or prorated equivalent basis, shall be immune from civil liability for damage or injury occurring on or after October 1, 1987, resulting from any act, error or omission made in the exercise of such person's policy or decision-making responsibilities if such person was acting in good faith and within the scope of such person's official functions and duties, unless such damage or injury was caused by the reckless, wilful or wanton misconduct of such person." General Statutes § 52-557m.

[34] Title 42 of the United States Code, § 14503, provides for limitations on the liability of volunteers for nonprofit organizations or governmental entities.

The plaintiffs further alleged in paragraph seventy-four that, as of the date of the complaint, the defendants had continued to refuse to surrender possession and control of the property of the Parish and had continued to use the property for an organization that was not "in communion with" the Episcopal Church. Accordingly, in light of the defendants' unwillingness to grant Reverend Cannon possession and use of the property, the plaintiffs requested, in addition to declaratory and injunctive relief, that the trial court order an accounting of the property.

On March 15, 2010, the trial court granted the plaintiffs' motion for summary judgment and denied the defendants' motion for summary judgment. The court also granted the plaintiffs' request for declaratory and injunctive relief, concluding that the "real and personal property of [the] Parish [is] held in trust for the Diocese . . . and the Episcopal Church, and that the defendants [were] without any right, title, interest or authority to occupy, use of possess the real and personal property [of the Parish]," and ordered that the defendants and all others acting under their control or direction refrain "from wasting, selling, transferring, conveying or encumbering any of [the] real and personal property." In addition, the court ordered that, "[w]ithin sixty days, the plaintiffs may move further for any orders of accounting. Any such motion shall be specific as to the type and nature of the accounting requested. The court shall retain jurisdiction for the implementation of these orders."

On April 7, 2010, the plaintiffs filed a motion for an order of accounting pursuant to "the equitable powers of the [c]ourt" set forth in General Statutes § 52-401 et seq. (accounting statutes). In their motion, the plaintiffs stated that the last audited accounting that they had received from the defendants was for the period ending December 31, 2006 (2006 report), which disclosed that

"the [d]efendants or their predecessors on the vestry of the Parish had custody or control of cash, investment, endowment and trust accounts or funds with an aggregate value of $320,034.55 . . . ." The plaintiffs thus proposed an accounting order that would include, among other things, the appointment of an auditor with all of the powers and duties set forth in the accounting statutes, the production of all requested records of financial transactions by the Parish since issuance of the 2006 report and the granting of permission for the plaintiffs' representatives to make an inventory of all personal property and records located on the real property of the Parish or in any other location owned or controlled by the defendants or persons acting under their control or direction.

On April 14, 2010, the defendants filed an objection to the motion in which they claimed that the plaintiffs' request for an order of accounting was, in reality, a claim for damages, and that, because the plaintiffs had claimed no damages in their complaint, there was no basis for such an award. They specifically argued that the allegations in the plaintiffs' complaint had been limited to prospective remedies, namely, declaratory and injunctive relief, and that any claim for damages would be inconsistent with such relief and barred by General Statutes § 52-557m and 42 U.S.C. § 14503. They also argued that the attorney general was responsible for monitoring funds devoted to charitable purposes under General Statutes § 3-125 and that the attorney general had represented to the trial court on October 16, 2008, that the matters litigated in this case "do not concern the use of charitable funds contrary to a charitable purpose." (Internal quotation marks omitted.)

On April 15, 2010, the trial court held a hearing on the motion. At the hearing, the plaintiffs argued that an accounting was necessary for the purpose of making a list of Parish assets to be turned over by the defendants.

The defendants countered that, although the plaintiffs had suggested that the accounting would consist of an inventory of Parish assets, they, in fact, were seeking information regarding money spent by the Parish so that they could make a future "backdoor . . . claim for damages . . . ." The defendants argued that the complaint did not include a claim for damages, and, therefore, if the plaintiffs had wanted an accounting, they should have pleaded that they had requested an accounting before they brought the action. The defendants also argued that any claim premised on a statute must identify the statute in the pleadings, which the plaintiffs had failed to do. The defendants reiterated that they were not objecting to an inventory but to "an end run to try to get money out of the . . . defendants . . . ." The plaintiffs responded that the accounting was the same as the relief requested in the complaint and that the purpose of such an accounting was to determine the assets that were present at the time Reverend Cannon had gone to the Parish for the keys to the property in order to ensure that the assets would be turned over to the plaintiffs.

The trial court declined to issue the plaintiffs' "proposed order" and to appoint an auditor under the accounting statutes but indicated that it might grant a request for an accounting under its equitable authority and discretion, irrespective of the accounting statutes. The court stated that it first contemplated "an inventory of the personal property because the real [property] is what it is, and possibly a production of books and records, more specifically financial records, so that they may either be reviewed or audited by an accountant. I might also entertain a tour and inspection of the facilities. I think I would contemplate matters of that nature but not the [plaintiffs'] proposed order . . . ." The court thus suggested that the plaintiffs submit another

proposed order and that the defendants file a written response.

The parties complied with the trial court's request, and, on June 2, 2010, the court granted the plaintiffs' motion and ordered an accounting on the basis of the plaintiffs' second proposed order. The court specifically ordered the defendants (1) to produce, within thirty days, "all books and financial records of the Parish . . . from January 1, 2007, to the date of the production," (2) "[to] permit the plaintiffs' representatives to make periodic tours and inspections of the Parish real property and buildings" according to the schedule described therein, and (3) to permit the plaintiffs' representatives to take an "inventory of all tangible personal property of the Parish," whether located on the Parish property or in any other location owned or controlled by any of the defendants or persons acting under their control or direction, within twenty-one days. The court retained jurisdiction for purposes of the order's implementation. On June 18, 2010, the defendants amended their appeal to include claims relating to the order of accounting.

This court previously has recognized that "it is within the equitable powers of the trial court to fashion whatever orders [are] required to protect the integrity of [its original] judgment." (Internal quotation marks omitted.) *Rocque* v. *Light Sources, Inc.*, 275 Conn. 420, 433, 881 A.2d 230 (2005); see also *Commissioner of Health Services* v. *Youth Challenge of Greater Hartford, Inc.*, 219 Conn. 657, 670, 594 A.2d 958 (1991) ("[c]ourts have in general the 'power to fashion a remedy appropriate to the vindication of a prior . . . judgment" [internal quotation marks omitted]).

In the present case, the trial court rejected the plaintiffs' original request for an order of accounting pursuant to the accounting statutes. When the court granted the plaintiffs' second request, it explained that it was

granting the order on the basis of its equitable authority and discretion to protect the integrity of its prior declaration that the real and personal property of the Parish was held in trust for the Episcopal Church and the Diocese and to protect its order enjoining the defendants and others from "wasting, selling, transferring, conveying or encumbering any of [the] real and personal property." The trial court further explained at a subsequent hearing on the plaintiffs' motion to compel compliance with the order of accounting that it had been "premised on the broad equitable authority of the court to issue such orders as may be necessary to effectuate the court's orders and to protect the plaintiffs' interests in the property at issue during the appeal. . . . To clarify further, the court emphasizes the following. The court's order of June 2, 2010 . . . [was] in the nature of orders of inspection or production in that [it was] limited and directed to allowing the plaintiffs to acquire information to facilitate the maintenance of the status quo pending appeal . . . . Specifically, the June 2, 2010 [order] . . . direct[s] the defendants to allow [the] plaintiffs access to records and the property of the Parish for review, inspection and possible inventory. [This order is] consistent with and operate[s] to ensure compliance with the court's orders that the defendants not waste, transfer or remove any of the property and for the defendants to use operating income only for expenses in the ordinary course . . . ." Accordingly, we conclude that the defendants' claim, which is premised on the plaintiffs' purported reliance on the accounting statutes and on the theory that the plaintiffs were seeking damages, has no merit.

## III

## MOTION FOR ORDER OF CONTEMPT

The defendants claim that the trial court improperly found them in contempt for failing to comply with the

order of accounting and that the order of contempt should be vacated because it was not clear and unambiguous, was based on the court's erroneous determination that the automatic stay provision set forth in Practice Book § 61-11[35] did not apply to an appeal from an order of accounting and was made without the presentation of evidence. The defendants also claim that the trial court abused its discretion in ordering punitive fines.

The plaintiffs respond that the defendants' claim that the order was ambiguous and that there was no evidentiary hearing should not be addressed by this court because the defendants never argued in the trial court that the order of accounting was ambiguous or that they were entitled to an evidentiary hearing. With respect to the automatic stay, the plaintiffs rely on the trial court's explanation that the defendants did not seek clarification of the automatic stay provision, as they had done on a previous occasion when they had questioned the operation of the court's injunctive orders pending their appeal but "simply chose to cherry pick which of the court's orders they would comply with and which they would ignore." Finally, the plaintiffs argue that the punitive fines were reasonable and that the defendants suffered no harm because they ultimately produced the financial records required under the order and thus no fines were imposed. We conclude that the defendants' claim is moot because, during the pendency of this appeal, they disclosed the requested financial records to the plaintiffs within the time required under the order of accounting and no fines were imposed. Accordingly, we dismiss the claim for lack of jurisdiction.[36]

---

[35] Practice Book § 61-11 (a) provides in relevant part: "Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to take an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. . . ."

[36] We do not consider the defendants' claim regarding the order of accounting to be moot because, although the defendants complied with the order,

Section 1 of the order of accounting required the defendants to produce to the plaintiffs, on or before July 2, 2010, copies of the books and records of the Parish reflecting its intangible personal property from January 1, 2007, to the date of production. Thereafter, the defendants amended their original appeal to appeal from the order of accounting. On June 22, 2010, the defendants' counsel also notified the plaintiffs' counsel that the defendants had "decided that . . . they will not provide the information [regarding the intangible personal property] outlined in [§] 1 of the court's order [for an accounting]." That same day, the plaintiffs' counsel responded that the plaintiffs did not regard the amended appeal as an automatic stay of the trial court's ruling and inquired whether the defendants intended to ask the court for a stay of § 1, but the defendants did not respond and did not seek a stay of the order.

The defendants subsequently complied with the other parts of the order of accounting but did not comply with § 1. Accordingly, the plaintiffs filed a motion for contempt on July 13, 2010, requesting the court to order that the defendants fully comply with § 1 without further delay, and that, if they persisted in their refusal to comply, to impose a fine on each defendant in an amount calculated to produce compliance. The defendants objected to the motion on the ground that the order of accounting had been automatically stayed by the filing of the amended appeal. Nevertheless, on August 24, 2010, the trial court held the defendants in contempt for failing to comply with § 1. It also ordered the defendants to provide all of the information required by § 1 within ten days and that, upon noncompliance and the filing of a motion for sanctions by the plaintiffs,

the issue may be raised again in the trial court if the plaintiffs seek additional production of financial records under the order of accounting from the time such records were previously provided to the time the plaintiffs came into possession of the property.

each defendant would be separately and individually fined the sum of $200 per day, commencing on the eleventh day following the date of the order and continuing until the defendants achieved full compliance. The court also ordered that no part of any fine could be paid or indemnified by the Parish or from any Parish funds or assets.

On August 26, 2010, the defendants filed a motion for review of the trial court's contempt order with the Appellate Court. On August 30, 2010, the Appellate Court dismissed the motion. Thereafter, the defendants produced copies of the Parish's financial records within the ten day deadline established by the order of contempt. On September 10, 2010, the defendants amended their appeal a second time to appeal from the order of contempt, and, on September 23, 2010, they moved for leave to file a supplemental brief in connection with their second amended appeal, which the Appellate Court granted on November 10, 2010. On that date, the Appellate Court also denied the plaintiffs' motion to dismiss the second amended appeal. No further amendments were made to the appeal.

"It is axiomatic that if the issues on appeal become moot, the reviewing court loses subject matter jurisdiction to hear the appeal. . . . Mootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical

relief through its disposition of the merits, a case has become moot."[37] (Internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 297 Conn. 105, 163, 998 A.2d 730 (2010).

We are unable to afford the defendants any practical relief by reversing the trial court's order requiring full compliance with the order of accounting. The defendants conveyed the pertinent financial records of the Parish to the plaintiffs after the Appellate Court dismissed their motion for review, and no financial penalties were imposed because the defendants produced the records within the deadline established by the order of contempt. See id., 160 (claim that trial court improperly concluded that certain pathology slides were patient " 'health record[s]' " within meaning of General Statutes § 19a-490b [a] and, therefore, that defendants were required to disclose them to plaintiff, was moot because, during pendency of appeal, slides were disclosed to plaintiff and subsequently returned to defendants). Accordingly, we dismiss the defendants' claim as moot.

---

[37] We have recognized that "a contempt finding has collateral consequences, even when no longer 'active,' unless or until it is vacated or rendered invalid"; *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 489, 497 n.17, 970 A.2d 570 (2009); accord *Kendall* v. *Pilkington*, 253 Conn. 264, 278 n.7, 750 A.2d 1090 (2000); and, in cases in which there is continuing litigation between the parties, a court's contempt finding may impact the defendant in the future. *Sgarellino* v. *Hightower*, 13 Conn. App. 591, 594–95, 538 A.2d 1065 (1988) ("[A] future citation for contempt, given the first finding of contempt which is the subject of [the] case, would make the defendant appear more recalcitrant than he might be, in fact. Such an impression is likely to affect a trial court's determination of the penalty attendant on any future finding of contempt . . . ."). In the present case, in which all issues have been finally decided and there is no prospect of continued litigation, the only possibility of a future finding of contempt would be in connection with a final order of accounting similar to the trial court's prior order. We foresee no prejudicial effect regarding the determination of the penalty should there be a future finding of contempt, however, because it is highly unlikely that the trial court would impose a greater penalty than the penalty previously imposed, which was sufficient to obtain compliance with the order.

The appeal is dismissed with respect to the defendants' claim regarding the finding of contempt and the judgment is affirmed in all other respects.

In this opinion the other justices concurred.